VINCENT RODRIGUEZ, Plaintiff-Appellee, v. NORFOLK AND WEST-
ERN RAILWAY COMPANY *et al.*, Defendants-Appellants.

First District (6th Division)   No. 1—89—2060

Opinion filed April 10, 1992.—Rehearing denied June 9, 1992.

RAKOWSKI, J., dissenting.

Ross & Hardies, of Chicago (Robert L. Landess, Daniel P. Hogan, and Raymond H. Grobel, of counsel), for appellants.

Terrence K. Hegarty & Associates, Ltd., and William J. Harte, Ltd., both of Chicago (Terrence K. Hegarty, James S. Smith, William J. Harte, and Joan M. Mannix, of counsel), for appellee.

JUSTICE LaPORTA delivered the opinion of the court:

Plaintiff Vincent Rodriguez sued C M C Real Estate, formerly known as Chicago, Milwaukee, St. Paul and Pacific Railroad (Milwaukee), and Norfolk and Western Railway Company (Norfolk) on charges of negligence and willful and wanton conduct alleging he was struck by something protruding from a Norfolk train as he walked alongside the train. Norfolk owned and operated the train, and Milwaukee owned the tracks and the railroad right-of-way which were elevated above street level at the scene of the occurrence at Grand and Cicero Avenues in Chicago. At the conclusion of the trial, a jury awarded Rodriguez judgment against both defendants in the amount of $6,122,466.76. In post-trial motions, the trial court rejected plaintiff's allegation of Norfolk's willful and wanton conduct as a matter of law and granted defendants' motion for a remittitur, reducing the net amount of the verdict to $3,060,604.90.

Defendants (Milwaukee and Norfolk) allege on appeal that they owed no duty to warn plaintiff of an open and obvious danger because plaintiff was a trespasser at the time of the accident and therefore the trial court erred in not directing a verdict in favor of defendants or granting judgment notwithstanding the verdict or granting a new trial. Further, Norfolk contends: it had no duty to ring the engine bell before moving and its failure to do so was not a proximate cause of plaintiff's injury; plaintiff's counsel's arguments were not supported by the evidence; the trial court erred in permitting three expert witnesses to testify for plaintiff when the names of the witnesses were not disclosed in a timely manner; and the amount of the award granted was clearly excessive.

This appeal arises from a personal injury suit filed by plaintiff against Norfolk and Milwaukee alleging negligence in that: (1) Milwaukee failed to fence a path leading to the right-of-way and to install a locked gate; (2) Milwaukee failed to post warning signs of the danger to pedestrians by the path leading up the embankment to tracks which were above street level; and (3) Norfolk failed to ring the engine bell to notify persons around the train of a potential danger. The second count charged that defendants' actions rose to the level of willful and wanton conduct because: (1) Milwaukee knew of the latent danger of standing near a moving freight train yet failed to warn plaintiff of that danger; (2) Norfolk operated a train from a standing to a moving position when it or its agent knew plaintiff was standing next to the train; and (3) Norfolk operated a train with a shifted load protruding off the side when it knew it was likely to

cause serious bodily harm to someone standing at the side of the train. Plaintiff alleged that defendants' negligence and/or willful and wanton conduct proximately caused plaintiff's injury on October 30, 1984.

At trial, 28 witnesses including plaintiff testified.

Robert Hesse testified that he was employed as a private investigator for the State of Illinois and assigned to go to the scene of the accident. He testified that he found a three-foot path up the embankment that was covered with ballast stone used on the railway right-of-way. He testified that three-quarters of the way up, stones had been laid flat to create steps. He testified that he found another path, this one made of dirt, on the other side of the tracks about 250 to 300 feet farther down the tracks.

Warren Taylor testified that he is the chief engineer for Belt Railway Company of Chicago. He identified the place where his company's property ended and where Milwaukee's began. He indicated on a map that the high stand switch used by Norfolk workers was located on Milwaukee property.

Robert Bielecki, a professional photographer, testified that he prepared for trial an aerial photograph of the accident scene.

Hector Gutierrez, who lives near the accident scene, testified that he "constantly" observed people climbing the path on the north side of the tracks, walking along the tracks and then descending at another point on the south side of the tracks. He testified that when he stood on one side of the path he could hear the voices of people on the other side. On cross-examination he testified that he had never used the path to cross the tracks. He testified that nearby Cicero Avenue had a place to cross the tracks that included sidewalks.

Robert Amidea, an auto mechanic who works at Grand and Cicero, testified that in the past he had seen children, adults and railroad workers use the path. He testified that railroad employees would use the path to gain access to repair the tracks and also to go down to the mini-mart grocer. He testified that he had never used the path.

Mark Maldonado testified that he lives less than a block from Grand and Cicero on the side of the tracks where the dirt path was located. He testified that he had seen "mainly younger teenager-type people" and some children use the path and that it "could have been a half dozen times during the summer."

Andrew Tryba testified that he manages a lumber company near Cicero and Grand and that "everybody and his brother: railroad workers, kids, grownups" would use the path. He testified that railroad workers would go down the path to buy sandwiches at the mini-mart

and fruit from a fruit stand next door to the lumber store located in front of the path in the parking lot. He testified that railroad workers would park in the lot to go up to repair the tracks.

Marvin Dahlstrom, a switchman on the Norfolk train involved in the accident, was called as an adverse witness and testified that he was working as the conductor on October 30, 1984, along with Ron Mangialardi, Richard Ross and a man named Jones. The train involved in the accident was commonly referred to as the 1159 because it left the yard at 11:59 p.m. He testified that the path from the tracks at Grand and Cicero was used by company employees to change crews and get picked up in company vehicles. He testified that he has seen members of the general public use the path. He also testified that a freight train usually stops about 10 or 15 minutes at that location where the high stand switch is located in order to get permission to cross over onto Belt Railway property.

Siomara Rodriguez, the plaintiff's sister, testified about plaintiff's background and laid the foundation to permit submission into evidence of photographs of plaintiff, both before and after the accident.

Gera-Lind Kolarik testified by videotape to authenticate a "Day in the Life" tape she made of Rodriguez for which she was paid $1,500. The videotape was then shown to the jury.

Ronald Mangialardi, a crew member on the 1159 train, testified that 59 cars were on the freight train involved in the accident. He testified that when he started working for the railroad company he was instructed to be careful when standing next to a freight train because of the danger of something dragging or hanging off the car. He testified that he has often seen lumber sticking out from freight cars and that during the four weeks before and the four weeks after the accident, he saw lumber protruding from at least one car every day on his shift with the 1159 run. He testified that when something protrudes approximately two feet out beyond the side of a car, the train should be stopped to correct the shifting load. He testified that in the four weeks prior to the accident his crew was under orders to complete its run in eight hours. He looked at the listing of cars on the 1159 train the day of the accident and testified that six carried lumber.

Plaintiff's counsel read a Norfolk rule to the jury: "The engine bell must be rung when an engine is about to move; except after momentary stops in continual switch movements."

Mangialardi testified that he knew of the path in question which was covered by railroad ballast and that it was used by railroad crews and the public. He testified that the morning of the accident, he got

off the caboose of the car to realign the switch and he saw two men, one, Rodriguez, who said the train had "gotten" him. Mangialardi testified that Rodriguez appeared injured on his left arm and was bleeding. He appeared to be in intense pain so Mangialardi testified that he told Rodriguez and a man who had come to Rodriguez' aid that he would get help. He ran back to the train to tell the conductor to call the paramedics. Mangialardi testified that when he and the conductor returned to the scene, Rodriguez was gone but a Chicago policeman was there who asked that they help find the end of Rodriguez' arm.

On cross-examination, Mangialardi testified that a shifted load could extend forward, backwards or even up in the air in the car as well as over the side of a car. He testified that he had the seniority that permitted him to choose to work the 1159 train. He also testified that he was "dismissed" from Norfolk in 1985 and had previously been dismissed in 1982.

Leonardo Elizondo, a jogger who came to Rodriguez' aid that morning, testified that he was jogging when he discovered Rodriguez crying out in pain. He tried to keep Rodriguez calm and bound up his arm with a jump rope to stop the bleeding while they waited for police to arrive. He testified that he asked Rodriguez what he was doing up on the railroad tracks and Rodriguez told him something about exercising. When a police car arrived, he helped Rodriguez in and they went to the hospital.

On cross-examination he testified that he jogged past the tracks every day and that he would "sometimes" see kids crossing over the tracks. He testified that he spoke to Rodriguez at the scene and at the hospital and that Rodriguez mentioned he was exercising and that he was blowing his nose when the accident happened. Elizondo testified that Rodriguez never mentioned that he heard voices on the tracks, or that he thought someone was in trouble or that he was hit by a piece of wood.

Glenn David Hagen, a train dispatcher for Belt Railway Company of Chicago, testified that he gave the 1159 permission to move onto Belt Railway tracks when he received a call from the conductor at 5:54 a.m. On cross-examination he explained that the 5:54 a.m. time only indicated the time he spoke with someone, it did not indicate the time the 1159 actually began moving.

Wayne Peterson, a meteorologist, testified that the sun rose at 6:22 a.m. on the day of the accident. He testified that twilight, the time preceding the sunrise, lasted 29 minutes on that day. He testified that at 5:44 a.m. on that day it would have been considered "dark" outside and visibility would have been poor. On cross-examination he

admitted that he worked at a Glenview weather observation point and that the sunrise in Chicago is technically two minutes earlier. He also acknowledged that his estimates of light and visibility were not based on any personal observation at Grand and Cicero and did not take into consideration any artificial light in the area.

Albert Bobby, a roadmaster in charge of track maintenance for defendant Milwaukee, testified that his crew was responsible for keeping the track in safe, working order. He testified that some of his crew used the path at Grand and Cicero on occasion to gain access to the tracks. He testified that if someone placed railroad ballast down the side of an embankment, his crew would remove it only if it caused a problem to the track structure.

Frank Benigno, a police lieutenant for the Belt Railway Company, testified that he went to the scene of the accident at about 8 a.m. on the morning that it happened and saw human ligaments or tendons about 12 feet west of the high stand switch. On cross-examination, Benigno described the path as a "rather steep" incline overgrown with weeds. He testified that he had difficulty going up the path and slid down as he tried to climb. He testified that on the date of the accident the path did not have as much gravel spread on it as the photo shown to the jury established. He said the photo shown to the jury also showed all the weeds cut down and new gravel spread down, neither of which appeared on the day of the accident. He testified the photos did not show the path as it appeared at the time of his inspection.

The evidence deposition of Chicago police officer Ronald Meziere was admitted. He testified that he took plaintiff to St. Anne Hospital the morning of the accident after someone stopped him and told him a man had been hit by a train. He testified that he dropped Rodriguez and Elizondo off at the hospital and then returned to the scene with a bucket of ice to find plaintiff's hand. He saw the dog in the van. He testified that he "had to use some strength" to climb up the path, which he called "kind of an obtuse angle, kind of steep." He said he and two other railroad workers located the hand quickly, probably within 50 feet of the path.

Meziere testified that he spoke with plaintiff in the emergency room and plaintiff told him he was exercising his dog up on the tracks and that he put the dog back into the van and went back up the tracks to watch the trains and "he fell or he *** was kind of like pulled towards the train."

On cross-examination Meziere testified that Rodriguez said this was "the second day that he was going up to the tracks to exercise

himself and his dog." He testified that plaintiff told him he went up onto the tracks to watch the train and plaintiff never mentioned anything about voices on the track or that someone might have been in distress.

Elaine Sarano testified to authenticate two X rays of plaintiff's arm. A hospital bill for $7,928.93 was also admitted.

Dr. Walter Reeder, a board-certified orthopedic surgeon, testified about the function and purpose of the human hand and explained the phenomenon of phantom pain. He testified that plaintiff had an amputation at his left forearm and that he performed surgery on plaintiff's arm the morning of the accident to clean and close the wound. He testified he was unable to reattach the hand since part of the forearm was missing and probably had been crushed. He testified that his office billed the plaintiff $1,105.

On cross-examination, Reeder testified that plaintiff suffered no injuries to his head, neck, back or knees, according to hospital records. He testified that he examined the wound closer to the trial date and found that it was well healed. He testified that plaintiff had been fitted for and used prosthetic devices.

Ben Fenger, a registered land surveyor, testified by videotape deposition and stated that he made a plat of the railroad property around the accident scene. He testified that the ballast path in question had a six-foot rise in elevation. He testified that another dirt path that led down to an alley appeared on the north side of the tracks 325 feet down the line.

James Poole, a personnel officer with the United States Marine Corps, testified by videotape deposition about the salary plaintiff was earning as a United States Marine in and around the time of the accident and what someone in that position would have earned in the subsequent years.

John Morris, a certified public accountant, testified by videotape deposition as to how much he estimated a staff accountant and a certified public accountant would earn at his firm in the years 1991 through 1995.

Michael Massie, who has a degree in architecture, testified as an expert, over defense objection, about design work he did for a railroad that included work on warning signs within railroad yards and remedies available to restrict public access to property. Massie testified about the size of the cars on the 1159 train, the danger of shifting loads on trains and the rule about ringing the train bell before moving a train from a standing position. Massie testified that if a train stops at a high stand switch for 5 or 10 minutes and then begins

to move, the failure to ring the engine bell would be in violation of industry customs and practices and of Norfolk rules. Massie testified that a path connecting a public parking lot to a railroad right-of-way is "an open invitation *** to physically walk from that area to the—to the other area. There is [*sic*] no warnings, no obstructions, no physical barriers to prevent it." Massie testified that ideally the area should be fenced off and warning signs with "graphic representations of what can occur" should be posted to indicate that "arms, hands or legs could be pinched off" or one could be "struck by moving equipment." He testified that according to industry custom and practice, if a train engineer saw someone enter the right-of-way via a path, he would have an obligation to "inform the individual of the hazards and ask him to leave. If he doesn't leave, then contact the proper authorities to have him removed."

On cross-examination, Massie acknowledged that railroad cars such as he described are differing widths, creating differing overhangs. He acknowledged that he did not take any measurements of the ballast in the right-of-way along the tracks. He conceded that if a fence were installed at the bottom of the slope at the beginning of the path at Grand and Cicero, it would have to be placed off of Milwaukee's property. Massie acknowledged that there are similar paths all over the State of Illinois.

Massie testified that he had had no formal education on the subject of fencing and property protection. He conceded that he was not a licensed architect and had worked as an architect for a period of only five months. He testified that his employment with the railroad as a switchman, trackman and draftsman was part-time summer work between college semesters. He acknowledged that his full-time employment with the railroad was as an engineer operating the trains and that he had never worked in a full-time capacity for a railroad in the engineering department nor had he ever been hired by any railroad with regard to rules, practice, regulation, property protection, security matters or engineering. He testified that he is paid $85 per hour as a consulting railroad practices expert and had worked less than 50 hours on this case but probably more than 30 hours.

Plaintiff Vincent Rodriguez testified that he was born in 1952, raised in Chicago and at the time of the accident he was 31 years old. He testified that after high school he spent three years in the United States Army and attended college, earning a degree in special education. He then joined the United States Marine Corps, obtained the rank of first lieutenant in July 1981 and was assigned to Camp Le-Jeune in North Carolina at the time of the accident.

On the morning of the accident, plaintiff testified that he left his mother's home where he was staying while on furlough and intended to take his dog to a forest preserve to exercise the dog. Plaintiff testified that he was dressed to exercise himself but had not yet decided whether to do so. He testified that he pulled into the parking lot at Grand and Cicero when his dog indicated to him that he needed to relieve himself. He testified there were a lot of bushes in the lot.

Rodriguez testified that he let his dog out of the van for about five minutes but put him back in so he could go look at "a white light in the distance" which he believed might be someone in distress. He said the parking lot was very dark and that he used a path of stones and a few steps to climb up the embankment, where he discovered the railroad tracks. He testified that he felt a rumbling and realized a train was coming and started back down the embankment but stopped when he heard some "mumbling voices, slurred speech," which he believed might be "hobos or somebody in need of help."

He testified that he continued going down the embankment and let his dog out of the car for another four or five minutes but he intended to return to the tracks. While the dog was out, the train came to a stop on the tracks right above him. He testified that as the train stopped, he saw someone jump off the train, cross in front of it and start "monkeying with the switch." Rodriguez acknowledged that he never yelled up to the man above him to discuss his concern about the voices. He testified that he "thought" the engineer looked at him as he stood next to the van.

Rodriguez climbed back up to the tracks but the switchman was gone. He testified that he looked down the length of the tracks and then began walking down toward the back of the train, stopping at the end of the first engine about 40 feet from the path. He testified that he never heard the voices again but he did continue to look around to see if he could see anyone. He testified that he could see about 40 feet. Plaintiff testified that he wore sneakers, a red jogging suit and a camouflage jacket and that in the military a camouflage jacket is worn "so you are not seen very well."

He testified that the train began moving and that he heard no bell ringing. He testified that as the second engine passed him he looked between the cars and then turned and started walking back toward the path and the switch. He testified that he stopped again and bent over to look under the train because he thought he heard something but then, hearing and seeing nothing, he decided to leave.

He testified that he was about a foot away from the passing engines or cars on his left and about 20 feet from the path and the high

stand switch when "I got hit by the train." He testified that something on the train, some wood, hit him in the back of the head and the back of the shoulder on the right side. He testified that he was pulled at an angle toward the train and in a split second his left arm was under the train and crushed.

His forearm was severed and Rodriguez testified that he thought he was going to die because blood was gushing out of his open wound. He testified that he got up, stumbled down the path and asked a man on the sidewalk to help him but the man walked away. He said another man, Elizondo, stopped and offered him comfort, tying a tourniquet around his arm and trying to wave down passing cars.

He testified that if he had seen a sign warning him of danger or a sign with a graphic description of somebody's limb being separated from the body he would never have gone up the path.

He testified that he had surgery on his arm the same day as the accident and realized shortly after that he could no longer plan for a career in the Marine Corps. Rodriguez testified about his post-surgery recovery, phantom pain he experienced and his effort to reassimilate into society. He testified that he currently was taking accounting classes. Plaintiff's medical bills totalling $9,665.93 were entered into evidence.

On cross-examination plaintiff testified that he still drove his own car, lived on his own and did most of his own housecleaning. He admitted that he was estimating his time of arrival at the accident scene at 5:45 a.m. on October 30, 1984. He acknowledged that his dog never went up the hill onto the tracks.

He testified that he would not have gone up the hill to investigate the white light or voices if there had been a sign warning of a potential danger "considering the low level of urgency." He testified that he did not know then that railroad trains were dangerous and he did not appreciate the possible danger of slipping, tripping or falling while standing within a foot of a moving railroad freight train.

He testified that when he returned to the tracks for a second time he did not speak with the engineer though he walked below him. He testified that when the train started moving he stood next to it briefly "looking between the engines and looking around." He acknowledged that he was struck on the right side of his body by a piece of wood although his left side was closest to the train.

On redirect examination, Rodriguez testified that he never told anyone he was taking his dog up on the tracks and he never exercised on the tracks. He denied that he made up hearing the voices. He testified that when he was one foot from the train he was as far away

from the train as he could be without falling down the hill. Plaintiff rested his case.

Norfolk and Milwaukee then moved the court for a directed verdict on behalf of all defendants arguing that because he was a trespasser defendants owed no duty to him as a matter of law. The motion was denied. Norfolk and Milwaukee then presented their witnesses in defense of plaintiff's claim.

Donald Jones, a Norfolk switchman on the 1159 train, testified that he had worked the 1159 train approximately 30 times before October 30, 1984. He testified that when his train stopped at the high stand switch the morning of October 30 he phoned the Belt dispatcher, realigned the switch and then signaled the engineer to proceed through the switch. He said he noticed a brown van parked in the parking lot but did not see anyone near it or around the train and its tracks. He testified that the engineer flashed his headlights to indicate that he had seen the signal and then the train proceeded through the switch, never traveling faster than five miles an hour. The train was stopped again so the switch could be realigned and then the train was given a signal to proceed.

He testified that a train car with a load that has shifted so as to protrude six inches or more over the edge of the car is called "a bad order car" and such a car is unfit for movement. He testified that he had never seen a switchman or car inspector permit "a bad order car" to leave the train yard.

On cross-examination Jones testified that he did not recall hearing the engine bell ring before the train started to move. He testified that in the 30 times he worked the 1159 train he had never seen the path at this location.

On redirect examination, Jones testified that he had worked with the train engineer, Ross, many times prior to October 30, 1984, and that Ross always blinked the headlights and rang the bell before moving the engine after being given a "come ahead" signal.

Marvin Dahlstrom, the train's conductor who had testified as an adverse witness in the plaintiff's case, returned to the stand and testified that on October 30 prior to leaving the Galewood yard, he inspected the engineer's side of the 1159 train, the side where plaintiff was later walking, and found no cars with loads protruding more than six inches over the side. He testified that he took no exception to any car on the train that morning. Dahlstrom testified that all trains are dangerous and that standing within a foot of a moving train is dangerous.

Michael O'Donnell, a Belt Railway car foreman, testified by videotape deposition that he was called upon on the morning of the accident to inspect a train parked at 31st and the Belt line southbound with regard to a personal injury accident. He testified that he had inspected "thousands" of trains prior to that date. He testified that he and a carman, Joe Romanowski, went to the train and inspected both sides twice for mechanical failures and for any signs of personal injury, such as blood. He testified that they checked for several things in their 1½-hour inspection including whether there was a shifted load or something sticking out.

He testified that Romanowski took notes during the inspection and then he, O'Donnell, sent a letter to his boss indicating that nothing unusual or out of the ordinary was discovered with regard to the personal injury accident. The letter stated that four cars had some air brake trouble. He testified that railroad cars vary in width between 9 feet 6 inches and 10 feet 8 inches. He testified that cars larger than that would require a special permit. He testified that he found no cars traveling under such a special permit registered on the 1159.

Richard Ross, the train engineer, testified that on the morning of the accident, as he waited for Jones to align the switch, he saw a van parked in a parking lot next to the railroad property. He said he saw a man dressed in a stocking cap and camouflage jacket who walked away from the van in the parking lot at the bottom of the embankment. He said he tried to contact property protection but could not establish radio communication. He testified that he tried to make the call because he thought it was unusual to see someone there at that time in the morning. "I just had a weird feeling. A man there at that time in the morning dressed the way he was, peeking or looking at me several times and just walking in a little area, basically around in circles. He really wasn't doing anything but standing there."

He testified that the stop at the high stand switch took about 15 or 20 minutes and that he could not recall ringing the engine bell before proceeding. He testified that he never saw the man in the jacket or anyone else on railroad property or approaching the train during that time.

On cross-examination, Ross was read a statement he gave to a claims agent: "Question, did you at any point use the, you know, the whistle or bell while you were proceeding on to the Belt once you started moving? Answer, no need to, no need to. Question—No railroad crossing or anything. No need, no need to." Ross explained that he interpreted the questioner to be asking whether he rang the bell while the train was in motion and that there was no need to.

Marvin Otten, a police officer for the Belt Railway Company in 1984, testified that he was called on the morning of the accident to inspect the 1159 train. He testified that he had previously worked as a switchman and therefore was trained to conduct train inspections. He testified that he spent 20 to 30 minutes inspecting both sides of the train and found nothing protruding from the train that could have hit plaintiff. He testified that he had a camera with him but took no pictures because there "was nothing to take a picture of."

On cross-examination, after a review of his deposition testimony, Otten admitted that he was sent to the scene to determine whether his company, Belt Railway, was involved in the accident. He admitted that he normally does not inspect trains.

The parties made closing arguments, the jury was instructed and after deliberation rendered a verdict in plaintiff's favor against the defendants for $6,122,466.76 with a finding that plaintiff was 18% contributorily negligent. The trial judge denied defendants' motions for a new trial and for judgment notwithstanding the verdict. The judge found no willful and wanton conduct on the part of Norfolk as a matter of law and entered a remittitur which reduced plaintiff's recovery to $3,060,604.90. Defendants' post-trial motions for judgment notwithstanding the verdict or for new trial in its entirety were denied.

On appeal, defendants raise seven issues: (1) whether Milwaukee owed a duty to the adult plaintiff to construct a fence to prevent him from gaining access to its right-of-way; (2) whether Milwaukee owed plaintiff a duty to warn him of the open and obvious danger of protruding loads; (3) whether the jury's verdict was improperly based on speculation, surmise and conjecture; (4) whether Norfolk's alleged failure to ring the engine bell was a proximate cause of plaintiff's injuries; (5) whether plaintiff's counsel's arguments were improper because they were prejudicial and not supported by the evidence; (6) whether admission of the testimony of plaintiff's expert witnesses was prejudicial error; and (7) whether the amount of the verdict was clearly excessive.

We consider the first two issues together because they deal with the threshold question of whether as a matter of law Milwaukee and Norfolk owed a duty of ordinary care to Rodriguez, an adult, to install a fence and warning signs or to warn him of the danger of a freight train on the railroad's right-of-way.

In order to state a cause of action for negligence, the allegations must establish the existence of a duty of care owed by defendants to plaintiff, a breach of that duty and an injury proximately caused by

that breach. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223.) The existence of a duty must be determined by the court as a matter of law, but the questions of whether there was a breach of that duty and whether that breach was a proximate cause of the injury are questions of fact for the jury. *Zimmermann v. Netemeyer* (1984), 122 Ill. App. 3d 1042, 1044-45, 462 N.E. 2d 502, 504.

Under Illinois common law, a judge's determination of the nature of the duty a landowner or occupier of land owes to an entrant on his land is governed by his status as a trespasser, licensee or invitee. *Miller v. General Motors Corp.* (1990), 207 Ill. App. 3d 148, 153-54, 565 N.E.2d 687.

An invitee is defined as one who enters the premises of another with the owner or occupier's implied or express consent for the mutual benefit of himself and the owner, or for a purpose connected with the business in which the owner is engaged or permits to be carried on upon the premises. (*O'Donnell v. Electro-Motive Division of General Motors Corp.* (1986), 148 Ill. App. 3d 627, 631, 499 N.E.2d 608.) A licensee is one who enters upon the premises of another with the owner or occupier's express or implied consent to satisfy his own purpose. (*O'Donnell*, 148 Ill. App. 3d at 631.) A trespasser is one who enters upon the premises of another with neither permission nor invitation and intrudes for some purpose of his own, or at his convenience, or merely as an idler. *Skoczylas v. Ballis* (1989), 191 Ill. App. 3d 1, 4, 547 N.E.2d 565.

The duty to a licensee or invitee differed under common law depending on the plaintiff's status. That distinction is not applicable here, however, since plaintiff's injury occurred after the September 12, 1984, effective date of the Premises Liability Act (Act) (Ill. Rev. Stat. 1989, ch. 80, par. 301 *et seq.*). The Act provides: "The distinction under the common law between invitees and licensees as to the duty owed by an owner or occupier of any premises to such entrants is abolished. The duty owed to such entrants is that of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." Ill. Rev. Stat. 1989, ch. 80, par. 302.

As to the licensee and invitee, a jury's determination can be set aside only when a court of review, or a trial court upon proper motion, is satisfied that it was occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 617, 126 N.E.2d 836, 841.

■ Generally, a railroad company owes no duty to a trespasser except to refrain from wantonly or willfully injuring him, and to use

reasonable care to avoid injury to him after he is discovered to be in peril. (*Lee v. Chicago Transit Authority* (1990), 205 Ill. App. 3d 163, 169, 562 N.E.2d 556, *appeal allowed* (1991), 137 Ill. 2d 665, 571 N.E.2d 149.) Illinois courts have carved out three exceptions to this rule of no duty owed to a trespasser: first, where the trespasser is a child; second, where the trespasser's presence on the premises has been discovered; and third, where habitual acquiescence by the landowner and tolerance is so pronounced that it is tantamount to permission so that the trespasser becomes a licensee. (*Lee*, 205 Ill. App. 3d at 169.) This third exception pertaining to habitual acquiescence has come to be called the "permissive use" exception.

Norfolk owed that same duty to plaintiff if it, as the land occupier, was in control of the property. *Simpson v. Byron Dragway, Inc.* (1991), 210 Ill. App. 3d 639, 569 N.E.2d 579.

Milwaukee and Norfolk contend plaintiff was a trespasser who did not fit into any of the exceptions and that therefore the trial court should have determined as a matter of law that plaintiff was owed no duty other than the duty of protection from willful and wanton misconduct on the part of Milwaukee. Plaintiff contends that he was a licensee upon the train track right-of-way and therefore was owed a duty of reasonable care, but that even if he was a trespasser, he was owed a duty imposed on defendant toward trespassers who make use of a permissive path, that is, a path which the landowner or occupier regularly permits the public to use.

■ We find that in this case the trial court should have found plaintiff was a trespasser as a matter of law. In his own testimony plaintiff stated that he voluntarily left the parking lot near the fruit stand and climbed the embankment up a gravel path. When he reached the top of the embankment he realized that the white light he saw was a train coming toward him on the tracks.

No one contends plaintiff was there at the railroad's request. These facts meet the definition of trespass in that plaintiff voluntarily entered the premises of the railroad without permission or invitation. Because a landowner is free to fix his own terms for consent, an intruder who comes on the possessor's land without his permission has no right to demand that the possessor provide him with a safe place to trespass, or that the possessor protect the trespasser from his own wrongful use of the possessor's property. *Miller*, 207 Ill. App. 3d at 154.

Plaintiff's intrusion was not for the benefit of the railroad but was for some other purpose. When he returned to his truck and then decided again to climb the embankment to investigate the voices, he did

so at his own convenience and for his own purpose only after spending another four or five minutes with his dog. He considered the situation a "low level of emergency." When he reached the top of the embankment, he spent some time walking the length of the stopped train and some time standing and looking at the train. If the testimony of the police officer on the scene and the jogger who assisted plaintiff is credible, the plaintiff acknowledged that he was on the tracks exercising prior to the accident. If we believe plaintiff thought someone might have been injured or was in need of help, these facts would not change his status as a trespasser. When an intruder enters where he has no right or privilege to go, he assumes both the responsibility for his own safety and the risk of what he may encounter. *Miller*, 207 Ill. App. 3d at 154.

■ Since we find that plaintiff was a trespasser on Milwaukee's property as a matter of law, it is plaintiff's burden to establish that he fits into the "permissive use" exception to the rule that a landowner owes no duty to a trespasser. (*Rosenthal v. Crystal Lake* (1988), 171 Ill. App. 3d 428, 525 N.E.2d 1176.) Under the permissive use exception, a landowner may owe a duty of care to trespassers, other than to refrain from willful and wanton conduct, when the landowner permits regular use of his land for travel. Liability has been extended in such cases because the landowner's continued toleration of the trespass amounts to permission to make use of the land, so that the plaintiff then is not a trespasser but becomes a licensee. *Miller*, 207 Ill. App. 3d at 155.

The permissive use exception was discussed in the early cases of *Morgan v. New York Central R.R. Co.* (1927), 327 Ill. 339, 158 N.E. 724, and *McDaniels v. Terminal R.R. Association* (1939), 302 Ill. App. 332, 23 N.E.2d 785.

In *Morgan*, a retired railroad worker was struck by a train while walking on defendant's right-of-way along a well-traveled path used by railroad workers and the public to travel between two streets. The court found that Morgan, though a trespasser, was owed a duty by the railroad to avoid willful and wanton injury to him since the railroad had notice of his presence in a place of danger. The court stated: "Even if there was a permissive use of the railroad company's right-of-way for longitudinal pedestrian travel and if the company was bound to anticipate the presence of persons passing along the path in question, it was not required to abandon the use of its right-of-way for the passage of trains and was certainly under no greater duty than the use of reasonable care to discover such persons and to avoid

injuring them when they were discovered to be in danger." *Morgan*, 327 Ill. at 344.

In *McDaniels*, a man was injured when a wooden girder was thrown or dropped from a bridge that extended over Wabash Railroad Company railroad tracks and over a path along its right-of-way. The defendant, Terminal Railroad Association, maintained the bridge under its contract with the Wabash and its employees were working on the bridge at the time of the accident. Testimony at trial established that the path was used on a daily basis for 20 years by many people including school children. The appeals court affirmed a jury verdict of $20,000 for plaintiff, stating: "The defendant company, as shown by the testimony of its employee, knew of the fact that such pathway was used by the general public, and under all such circumstances defendant company owed a duty to the plaintiff to watch out for him and for members of the public *** before throwing objects on to such pathway." *McDaniels*, 302 Ill. App. at 345.

Modern day application of the permissive use exception is found in cases such as *Lee v. Chicago Transit Authority*, 205 Ill. App. 3d 163, *Miller v. General Motors Corp.*, 207 Ill. App. 3d 148, *Trout v. Bank of Belleville* (1976), 36 Ill. App. 3d 83, 343 N.E.2d 261, and *Eaton v. Baltimore & Ohio R.R. Co.* (1990), 198 Ill. App. 3d 137, 555 N.E.2d 790.

In *Lee*, a drunken man was killed when he stepped on the street-level third rail of a Chicago Transit Authority (CTA) train track and was electrocuted. In 1990 the appellate court reversed a jury verdict awarding the man's wife $1.5 million because it found that the man was a trespasser. The man had entered the CTA's right-of-way to urinate and the CTA presented uncontroverted evidence to establish that the man was neither invited nor permitted to be on the right-of-way. The court found that the man's status could not rise to that of licensee because the CTA did not acquiesce in the use of its right-of-way as a path. *Lee*, 205 Ill. App. 3d at 169-70.

In *Miller* a 20-year-old trespasser was injured when he grabbed a live electrical wire while scaling a nine-foot wall to climb onto a pumphouse balcony on defendant's land. The appellate court stated that a duty of reasonable care to discover and protect trespassers is imposed on a landowner or occupier who knows or should have known that trespassers are in the habit of entering his land at a particular point. But the court held that in the case before it, though defendant was aware of a trespasser problem on the pumphouse property, defendant had no reason to anticipate that a trespasser would do what plaintiff had done. *Miller*, 207 Ill. App. 3d at 161.

In *Trout* and *Eaton*, the court has imposed a more stringent burden of proof. Both cases hold that habitual acquiescence in a trespass may constitute a license if the tolerance is pronounced enough to be tantamount to permission; yet even in such a case, the plaintiff will not be able to recover by showing mere negligence, but only by showing willful and wanton conduct. *Trout*, 36 Ill. App. 3d at 87; *Eaton*, 198 Ill. App. 3d at 140.

*Trout* cites *Illinois Central R.R. Co. v. Eicher* (1903), 202 Ill. 556, 570, 67 N.E. 376 (a mere passive acquiescence by an owner or occupier in a certain use of his land by others involves no liability), and *Dent v. Great Atlantic & Pacific Tea Co.* (1955), 4 Ill. App. 2d 500, 506, 124 N.E.2d 360 (the owners and lessees of premises owed to a mere licensee or trespasser no duty except not to willfully injure him). All three of these cases (*Trout, Eicher* and *Dent*) were decided before the Premises Liability Act abolished the distinction between invitee and licensee in 1984 and therefore are not pertinent to our discussion. *Eaton* was decided after the Premises Liability Act was adopted; however, it relied solely on *Trout* and we believe that reliance was ill placed.

We are persuaded by the rationale in the more current cases of *Lee* and *Miller*, which hold plaintiff was owed a duty of ordinary care only if he was a trespasser to whom the permissive use exception applied. We find, however, that the record does not support the conclusion that the exception applies nor has plaintiff met his burden of establishing his status as a matter of law as a trespasser who fits into the permissive use exception.

The evidence presented at trial, much of it through plaintiff's own testimony, established that plaintiff was not aware of a path on the other side of the track and had never been to the location before. Therefore, we cannot conclude that he entered the property to cross to the other side. Previous use of the path by other members of the public is immaterial to plaintiff's case because it cannot be relied on to establish that he was on the premises as a result of an implied invitation (*Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 187, 81 N.E.2d 866, 869) because the owner habitually permitted such entry.

Because the question of plaintiff's status should be decided as a matter of law if there are no factual questions present (*Lorek v. Hollenkamp* (1986), 144 Ill. App. 3d 1100, 495 N.E.2d 679), we hold that on the evidence in the record the trial court erred in denying defendants' motion for judgment notwithstanding the verdict.

We find plaintiff was a trespasser to whom the permissive use exception did not apply. Plaintiff was unaware of any previous use of

the path. Plaintiff's witnesses, Gutierrez and Amidea, testified that they had observed people climbing the path but had never used it themselves. Maldonado, who lives across from the dirt path, testified that he had seen younger people using the path as many as "half dozen times during the summer." Tryba testified that "everybody and his brother" used the path. Tryba and Amidea worked in the area. No one testified that they had seen anyone ever cross the tracks at night, or in the early morning hours, or in times of darkness. No one else testified that they themselves had ever used the path to cross the tracks.

This case is closer factually to the *Lee* case, where a drunken person crossed CTA tracks and was electrocuted by the third rail. This case is similar to the *Miller* case, which held that the defendant could not have anticipated plaintiff's actions in climbing the tower.

The facts of this case differ from the factual circumstances of *Morgan* and *McDaniels* in which the court first defined the permissive use exception. In *Morgan*, the plaintiff was injured while crossing under a bridge built to extend both over train tracks and the "railroad company's right of way for longitudinal pedestrian travel." (*Morgan*, 327 Ill. at 344.) In *McDaniels* the court found that the use of the path was a general permissive use because the railroad had permitted a considerable number of people to travel over the tracks for a considerable period of time. *McDaniels*, 302 Ill. App. at 345.

■ Plaintiff also contends that defendant's conduct in building the path by dropping ballast down the embankment was an invitation to the public to use the path and therefore raised plaintiff's status to that of licensee. However, even as a licensee plaintiff must avoid open or obvious danger and uses the land at his peril. *Lorek*, 144 Ill. App. 3d at 1103.

Plaintiff went up the embankment, saw a white light in the distance which he testified he knew to be an approaching train. He then went down the embankment to a position of safety for a brief time while the train arrived and stopped at the top of the embankment. Plaintiff then went back up the path to the track where the multicar freight train was temporarily stopped while the switch was being activated.

We must conclude that plaintiff, a 31-year-old, college-educated Marine was aware of the danger of freight trains. He had no mental disability which would impair his comprehension of the danger. No duty exists to warn plaintiff of a condition of which the plaintiff already has knowledge. *Lorek*, 144 Ill. App. 3d at 1103.

In addition, if an invitee deviates from the accustomed way or goes to a place other than that place covered by the invitation, the owner's duty of care to him as an invitee ceases forthwith. (*Briney*, 401 Ill. at 188.) We believe the same conclusion holds true for a licensee or trespasser who purposefully deviates from the scope of an implied invitation.

Any implied invitation plaintiff might have had would have been an invitation to use the path to cross the tracks. He did not testify that he intended to do so and he obviously could not do so when he climbed the embankment the second time with full knowledge that a freight train was stopped on the tracks. Plaintiff testified that he was going to the aid of someone he thought was in trouble whereas two other witnesses testified that on the date of the accident plaintiff told them he was exercising on the tracks. While we do not agree that implied invitation has been established by the evidence in the record under either set of facts, we believe plaintiff deviated from any alleged implied invitation to use the path to the railroad property.

██ Norfolk also alleges it was error to permit plaintiff's counsel to argue that Norfolk had a duty to ring the bell before moving its freight train and that failure to ring the bell was the proximate cause of plaintiff's injury. Milwaukee alleges that it was error to permit plaintiff's counsel to argue that Milwaukee had a duty to fence off the path leading to the track, post warning signs or warn of the "latent danger" of standing near a moving train. We agree. Plaintiff was a trespasser. As a matter of law the only duty owed to plaintiff by Milwaukee and Norfolk was to avoid willful and wanton conduct.

██ The trial court correctly found as a matter of law that Norfolk was guilty of no willful and wanton conduct. The court held that the evidence as to Norfolk "falls short of giving support to a finding of willful or wanton misconduct predicated either upon intent or upon reckless disregard for the safety of others." The judgment against Norfolk with regard to its negligence therefore was error and requires reversal.

As to Milwaukee, the trial court found "evidence, though admittedly thin," which created an "inference of conscious disregard" for the safety of others in Milwaukee's failure to warn of the "latent dangers of standing near a train." We do not agree with the findings of the trial court that the freight train and its cargo could be considered a "latent danger" of which plaintiff should have been warned or that Milwaukee had a duty to warn. The definition of "latent" is something "dormant," "hidden" or "concealed." (Black's Law Dictionary 794 (5th ed. 1979).) This 59-car moving freight train elevated above

ground level on railroad property and reachable by plaintiff only by scaling the steep embankment on railroad property was not "dormant," "hidden" or "concealed" from this adult plaintiff. For this reason the court's finding that the danger was latent was error and the judgment against Milwaukee with regard to both its negligence and willful and wanton conduct should be reversed.

Because we reverse the judgment on the basis that defendants owed the plaintiff trespasser only a duty to avoid willful and wanton conduct and that the record does not establish the breach of such duty, we need not address other matters raised by defendants concerning improper and prejudicial remarks by plaintiff's counsel, the alleged excessive judgment or defendants' contention that the verdict was based improperly on speculation, conjecture and surmise.

Judgment reversed.

EGAN, P. J., concurs.

JUSTICE RAKOWSKI, dissenting:

Assuming, *arguendo*, that Vincent Rodriguez was a trespasser, I disagree with the majority's conclusion that Rodriguez failed to establish that he fit into the "permissive use" exception to the rule. Because this, and whether defendants breached their duties of ordinary care, was a fact question for the jury to decide, because the record contains sufficient evidence to support the jury's determination of the issues, and for other reasons which will be discussed, I would affirm the judgment against defendants.

EXCEPTIONS TO THE GENERAL RULE OF NO DUTY TO TRESPASSERS

As the court observed in *Lee v. Chicago Transit Authority* (1991), 205 Ill. App. 3d 163, 169, 562 N.E.2d 556:

"Generally, a railroad company owes no duty to a trespasser except to refrain from wantonly or wilfully injuring him, and to use reasonable care to avoid injury to him after he is discovered to be in a position of peril. [Citations.] This limited duty is based on the concept that the law does not require an owner or occupier of land to anticipate the presence of persons wrongfully or unexpectedly on his land. [Citation.] There are, however, three exceptions to this general rule of limited duty. The first is for young children who the owner knows habitually frequent the vicinity of a defective structure or dangerous agency existing on the land and who by reason of their immaturity

cannot appreciate the risk involved. [Citations.] The second exception applies to trespassers using permissive paths. (*Morgan v. New York Central R.R. Co.* (1927), 327 Ill. 339, 158 N.E. 724.) The third exception is for discovered trespassers. [Citations.]"

The majority acknowledges the existence of the "permissive use" exception, which some cases discuss under the rubric of "habitual acquiescence," and may properly be characterized as applying to frequent trespasses upon a limited area. Other cases and authority which have discussed this exception include *McDaniels v. Terminal R.R. Association* (1939), 302 Ill. App. 332, 23 N.E.2d 785, *Miller v. General Motors Corp.* (1991), 207 Ill. App. 3d 148, 565 N.E.2d 687, and M. Polelle & B. Ottley, Illinois Tort Law 459 (1985).

### REASONS FOR THE FREQUENT TRESPASS EXCEPTION

The reason for the exceptions to the general rule of nonliability of a landowner to a trespasser is stated in *Miller.* There, the court observed:

"[The] exceptions have developed because of the concern that human safety ought to be more important than the landowner's interest in unrestricted freedom to use his own land as he sees fit. This view is especially prevalent in cases in which the burden on the landowner and the expense in taking precautions to prevent harm are not great. [Citation.] If that burden is very slight, and if the risk of harm to the trespasser is correspondingly very great, some commentators have found good reason to hold the landowner liable for injuries sustained on his land by the trespasser. This rule applies mostly in the case of frequent trespass upon a limited area. [Citation.]" 207 Ill. App. 3d at 155.

The *Miller* court further observed:

"When a landowner knows, or should know from the facts within his knowledge, that trespassers are in the habit of entering his land at a particular point or of traversing an area of small size, many courts hold that there is a duty of reasonable care to discover and protect trespassers in the course of the landowner's activities. (Restatement (Second) of Torts §334 (1965).) This duty is imposed because the burden of looking out for trespassers is not great. *A typical case is the frequent use of a 'beaten path' that crosses a railroad track,* which is held to impose a duty of reasonable care as to the operation of trains. [Citation.] *** Liability has been extended in such cases be-

cause the landowner's continued toleration of the trespass amounts to permission to make use of the land, so that the plaintiff is not a trespasser but a licensee. [Citation.] While it is true that a failure to object may amount to tacit permission, the mere fact that the landowner does not take burdensome and expensive precautions to keep trespassers out, which may well be futile, should not in itself indicate that he is willing to have them enter. [Citation.] The real basis of liability to such 'tolerated intruders' would seem to be only the ordinary duty to protect another, where the harm to be anticipated from a risk for which the defendant is responsible outweighs the inconvenience of guarding against it. [Citation.]" (Emphasis added.) 207 Ill. App. 3d at 155-56.

It must be emphasized that there are two separate defendants in the case *sub judice*—the railroad company which owns subject property (landowner), including the ballast path and the right-of-way, and the railroad company (right-of-way user) which used the right-of-way with the permission of the landowner. It is important that the respective duties and breaches thereof be distinguished. I shall, therefore, discuss defendants' respective duties and respective breaches separately.

### RESOLUTION OF THE FACTUAL ISSUE OF WHETHER
### THE FREQUENT USE EXCEPTION APPLIED

Initially, however, the issue of whether Rodriguez established that the frequent trespass upon a limited area exception applied must be addressed. As to the issue of plaintiff's status at the time of the incident, as the majority indicates, a jury's determination can be set aside only when a court of review, or a trial court upon proper motion, is satisfied that it was occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. See *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 617, 126 N.E.2d 836.

The relevant facts elicited at trial include the following. Witnesses described the path which Rodriguez took from the parking lot. The path was about three feet wide and led from the lot up the southern side of the embankment to the railroad right-of-way at the top. The path was covered with whitish railroad ballast stone. About three-quarters of the way up, pieces of stone material had been laid flat to form steps. Across the tracks, some 300 feet to the west, a dirt path led down from the right-of-way into an alley.

Witnesses also testified that the stone path was heavily used, in the words of one witness, by "everybody and his brother, railroad

workers, kids, grown-ups." Railway workers would park in the lot and take the path up to the tracks to do repair work. Train crews would come down the path and go to the fruit stand by the parking lot. Nonemployees also climbed the path, as Rodriguez did. Members of the public "constantly" climbed up one path, crossed the tracks, and came down the path on the other side.

Witnesses told the court about the dangers posed by lumber on freight trains. Lumber is transported on a flat car, wrapped in steel bands, with a wedge-shaped piece of lumber placed on the side of the car to hold the load. During transport, the load can shift and protrude from the side of the car. If the lumber shifts two feet or more, it may strike a bridge or passing train. Lumber protruding even a few inches may hit someone standing right next to the train. Consequently, new railroad employees are warned about this danger and told not to stand next to moving freight trains.

According to Rule 30 of the Norfolk and Western Railway operating rules, the engine bell must be rung when the engine is about to move. Rodriguez claimed that the bell never rang. Railroad employees did not remember whether the bell rang before the engine began to move while Rodriguez was on the tracks.

In this case, testimony at trial established that the path leading up to the right-of-way not only appeared to be a public path, but in fact was constantly used by members of the public. Once upon the right-of-way, pedestrians crossed the tracks, walked along the right-of-way and descended by use of the dirt path into the alley. Mark Maldonado, an area resident, testified that he had "always seen people *going up and down those tracks.*" (Emphasis added.) Maldonado saw people "up there," and recounted the use of the area by one particular individual "who used to be up there all the time just about." Maldonado saw this individual "walking *on the railroad tracks,* actually" (emphasis added; as opposed to walking *across* the railroad tracks). Andrew Tryba, who worked close by, testified that he had seen people use the ballast pathway "to get up to the railroad track *area*" (emphasis added; as opposed to going up to simply cross the tracks). Hector Gutierrez, another resident of the area, testified that people constantly walked up the stone path and crossed the tracks to the other side. People would then exit the area via the dirt path.

In my opinion, the foregoing testimony is clearly sufficient for the jury to have concluded that the general area where Rodriguez was injured was an area which the public used frequently enough that defendants could reasonably anticipate that an individual might be there. In fact, the specific location of Rodriguez's injury appears to

have been only about 20 feet from the ballast path, in between the ballast path and the dirt path. Not only was there frequent public use of the area where plaintiff was injured, but the path leading onto the property, according to plaintiff's expert, had the physical appearance of a public path. In fact, defendants point to no evidence in the record to contradict that there was regular public use of the area in question, and an overhead-view photograph of the area in the record supports the witnesses' testimony concerning the layout of the area. In my view, the foregoing evidence more than supports an application of the frequent trespass exception.

The cases relied upon by the majority, *Lee* and *Miller*, are easily distinguishable. In *Lee*, the plaintiff was electrocuted while urinating by the third rail, and the evidence established that the CTA in no way acquiesced in the use of its right-of-way. "Rather," according to the court, "it posted warnings, erected right-of-way fencing, installed wooden access barriers and chain link fences, and designed and implemented 'jaws' to prevent unauthorized persons from entering that right-of-way." (*Lee*, 205 Ill. App. 3d at 170.) Moreover, in *Lee*, there was no testimony of a path or constant pedestrian use of the area where the accident occurred. Finally, in *Lee*, there was testimony of only one previous electrocution (a few years earlier) at the place where plaintiff's decedent was injured in the quarter-century prior to the incident which led to the suit. The instant case does not even remotely resemble *Lee*. Here, people used the area constantly and here, of course, there was a total absence of protective measures to keep individuals away from the area.

In *Miller*, the plaintiff entered the defendant's land, unsolicited and uninvited, and "scale[d] a nine-foot wall using eyebolts, crawl[ed] through a small opening in the ceiling, and explore[d] an elevated, enclosed balcony." (*Miller*, 207 Ill. App. 3d at 160.) In exploring the pumphouse structure, because he was curious, plaintiff came into contact with an electrical wire, injuring himself. Further, in *Miller*, there was evidence that defendant had taken precautions to keep individuals out, and there was testimony that there was not a frequent problem with trespassers. *Miller*, for these reasons among others, is highly distinguishable from this case.

Nor am I persuaded by the majority's reliance upon the facts that it was dark out and that plaintiff had never been to the area before. There is no testimony in the record establishing that the area was *not* used during hours of darkness. In fact, according to one witness, people often used the path commuting to and from work. This suggests that some pedestrian use of the area in the early morning or early

evening hours did occur. As a result, some use of the area during hours of darkness, particularly during winter months, is inferable.

The majority cites no compelling authority for the proposition that because plaintiff had not been to the area before, he could not have benefitted from a heightened duty. The fact that plaintiff had not been to the area of the tracks before does not take away from the public nature and appearance of the ballast path, and given the repeated pedestrian use of the area, the jury could determine that defendants should have been aware that people would often be on the track area. Nor is *Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 81 N.E.2d 866, cited by the majority, controlling. Unlike *Briney*, the issue in this case is not whether plaintiff was an invitee, but rather whether plaintiff was a trespasser to whom the frequent trespasser exception applied. In *Briney*, the defendant was in the habit of allowing neighborhood boys to do its work for it—throw switches—and in return, defendant often gave the boys fruit. However, the *Briney* record did not contain facts from which it could be inferred that the individual plaintiff knew of this arrangement. Accordingly, plaintiff could hardly be said to have been an invitee, upon defendant's property for the mutual benefit of himself and defendant. Put another way, the issue in *Briney* was whether there was an actual invitation to plaintiff, while in the case *sub judice*, the issue involves implied consent or toleration, and the exception to the trespasser rule based on frequent trespass in a limited area. *Briney* is therefore not controlling. I also note that the United States Court of Appeals for the Seventh Circuit, in a case applying Illinois substantive law, has held an individual to be a licensee, given repeated public use of property even though the individual had not been upon the property (a private road) before. See *Wrigley v. Electric & Machine Co.* (7th Cir. 1969), 419 F.2d 972.

## DUTY OF THE LANDOWNER

The Restatement (Second) of Torts §335 (1965) provides: ·

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if

(a) the condition

(i) is one which the possessor has created or maintain[ed] and (ii) is, to his knowledge, likely to cause death or seriously bodily harm to such trespassers and (iii) is of such a

nature that he has reason to believe that such trespassers will not discover it, and

(b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved."

Illinois law is clear as to whether a duty should be imposed. Foreseeability alone does not govern the determination; "[t]he likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant, must also be taken into account." (*Lance v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231.) In commenting upon the above language from *Lance*, the court in *Zimmermann v. Netemeyer* (1984), 122 Ill. App. 3d 1042, 1047, 462 N.E.2d 502, observed:

"[D]uty in a negligence case is a matter of policy as well as foreseeability of harm so that in many cases the determination of duty is refined to: The existence of a legal duty is not dependent on the factor of foreseeability alone, but includes considerations of public policy and social requirements. [Citations.]"

*Zimmermann* further observed: "[D]uty is not sacrosanct in itself, but only an expression of *** policy which lead[s] the law to say that the particular plaintiff is entitled to protection." 122 Ill. App. 3d at 1052-53, citing W. Prosser, Torts §54, at 326-27 (4th ed. 1971).

In this case there is no question that a condition existed which was likely to cause death or great bodily harm. Given the trial testimony of constant pedestrian use of the path, the question was not whether an accident would happen, but when and to whom. As will be discussed *infra*, the danger in this case was not open and obvious. There was testimony that even railroad employees needed to be warned of the danger of protruding loads and standing too close to a moving train. Nor would it be any great burden upon the landowner to fence this limited area, or at the very least post warnings. Because the facts of this case are well within section 335, because the burden to the landowner is very slight and because the risk of injury to the trespassers is great, I believe the trial court acted properly in imposing a duty. See *Miller*, 207 Ill. App. 3d at 156.

### DUTY OF RIGHT-OF-WAY USER

The Restatement (Second) of Torts §334 (1965) provides:

"A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area thereof, is subject to liability for bodily harm caused to them by his failure to carry on an activity in-

volving a risk of death or serious bodily harm with reasonable care for their safety."

I am likewise convinced that the evidence at trial was sufficient to hold the right-of-way user to the standard of conduct prescribed by section 334. Given the constant and repeated use of the area in question which is reasonably inferable, I do not feel the trial court erred in holding that the right-of-way user had a duty to ring its bell before resuming movement, along with the axiomatic duty to keep a proper lookout in a highly populated area. The burden to the right-of-way user in this case is simply to use reasonable care to avoid protrusion of loads in this highly populated area, ring its bell before resuming movement and lookout for individuals in the area. The burden of guarding against injury and the consequences of imposing this burden on the right-of-way user are in fact lesser than *vis-a-vis* the landowner.

### RESOLUTION OF THE FACTUAL QUESTION OF BREACH OF DUTY

A word concerning the proper deference we should accord the jury is in order. Courts should direct verdicts or enter judgments *n.o.v.* only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 139-40, 554 N.E.2d 223.) It is well settled that a jury verdict should not be set aside "merely because the jury could have drawn different inferences and conclusions from conflicting testimony." (*Treadwell v. Downey* (1991), 209 Ill. App. 3d 999, 1002.) If reasonable minds may differ as to inferences and conclusions to be drawn from the facts, then judgment *n.o.v.* should not be entered. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 509-10.) Courts should grant new trials only when the jury verdict is against the manifest weight of the evidence and appears to be palpably erroneous. *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 443, 511 N.E.2d 798; *L.D. Brinkman & Co.-Midwest v. National Sponge Cushion Co.* (1979), 76 Ill. App. 3d 683, 688.

Rodriguez's testimony that protruding lumber struck him was clear. When asked if he was sure it was wood that struck him, he stated: "It was wood. *** It's a fact. I worked with wood. I have worked with lumber, I have built porches, I know wood. *** [W]ith lumber you get a spring action to it ***." Rodriguez testified that the wood pulled him down and into the path of the moving train.

As indicated, the landowner in the case *sub judice* neither fenced the area around the ballast path, nor placed signs warning of the dan-

ger or prohibiting trespassing. The resolution by the jury that the landowner breached its duty is therefore clearly a reasonable one. Likewise, the jury could reasonably have found that the right-of-way user breached its duty in not ringing the warning bell, whose purpose was to warn people that the train was moving, and whose effect, Rodriguez clearly testified, would have been to influence him to immediately leave the area. Rodriguez testified that he would have associated the ringing of a bell with "danger," and as a "warning signal" and that he would have "left the area immediately." The jury could reasonably have concluded that the bell should have been rung, given its determination that the right-of-way user operated a train with lumber protruding from a car, in this area frequented by the public, where the facts indicate the right-of-way user did not effectively look out for plaintiff's presence.

Simply put, the question of breach in this case was a jury question, and the jury's finding was neither palpably erroneous nor against the manifest weight of the evidence. Nor are we presented with a situation where the evidence, taken in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. In fact, had the jury returned a verdict in favor of either or both defendants, I would likewise abide by that result. The decision here was for the trier of fact, was properly made by the jury, and should not be set aside merely because reasonable minds may differ as to the inferences and conclusions to be drawn from the facts.

### WHETHER THE DANGER WAS "OPEN AND OBVIOUS"

I disagree, further, with the majority's brief implication that the danger in this case was open and obvious as a matter of law. If the danger was merely the presence of trains themselves, I would not hesitate to agree that the danger was open and obvious. (See *Dunn v. Baltimore & Ohio R.R. Co.* (1989), 127 Ill. 2d 350, 537 N.E.2d 738.) The danger in this case was that of shifting and protruding loads, as plaintiff testified that he was struck by a piece of lumber. The evidence established that Rodriguez was unaware of the danger of being struck by a piece of wood. Plaintiff's expert testified that he was unaware of such a danger before he was employed in the railroad business. One of defendant Norfolk's own switchmen, Mangialardi, testified that he himself was not aware of this danger before he was trained to be alert for it. In light of the above, I do not feel that we can say that the danger of shifting and protruding loads is so "blatantly obvious" that defendant "could not reasonably be expected to

anticipate that people will fail to protect themselves" from danger posed by the condition. See *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 139-40, 554 N.E.2d 223.

In short, I disagree with the majority's conclusions that plaintiff was a trespasser to whom the frequent trespass upon a limited area exception did not apply. I believe that duties of reasonable care may properly be imposed upon defendants given the constant public use of the area where Rodriguez was injured, and I believe that the jury's resolution of the factual questions relating to defendants' breaches of their duties should not be disturbed. I further disagree that the danger in this case was open and obvious as a matter of law, and seeing no reversible error among defendants' other contentions of error, I would affirm the judgment of the circuit court.