CORA LEE RHODES, as Special Adm'r of the Estate of Carl Rhodes, Deceased, Plaintiff-Appellee, v. ILLINOIS CENTRAL GULF RAILROAD, Defendant-Appellant.

First District (3rd Division)   No. 1—93—2570

Opinion filed December 7, 1994.—Rehearing denied January 13, 1995.

Stephen C. Carlson and John F. Svolos, both of Sidley & Austin, and Michael Schneiderman, both of Chicago, for appellant.

Eileen M. O'Sullivan, of Jerome Mirza & Associates, Ltd., of Chicago, for appellee.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Illinois Central Gulf Railroad (ICG), was found liable for the death of Carl Rhodes. The jury awarded plaintiff, Cora Lee Rhodes, special administrator of the estate of Carl Rhodes, $1.568 million in damages. On appeal, defendant asserts that the trial court erred in determining as a matter of law that it owed Rhodes a duty of ordinary care. We affirm the circuit court's judgment for the reasons that follow.

The issue in this case is whether the defendant railroad owed plaintiff a duty to exercise ordinary care for his safety after the railroad's agents observed plaintiff lying on the floor of the railroad's waiting room over a long period of time, unconscious and with his head covered with blood.

Raymond Deany, an ICG conductor, testified that he was operating an ICG passenger train on November 29, 1986, at 5:02 a.m. when it stopped to pick up passengers at the unstaffed 75th Street and Exchange Avenue station in Chicago. When a passenger told him that a man was lying down in the waiting room, Deany got off the train to investigate. He and the train's collector, Casimir Ziolkowski, looked into the waiting room through the doorway.

Deany stated that he saw the man, who was later identified as Rhodes, lying face down on the floor. He noticed a small amount of blood around Rhodes' head, but did not notice anything else around him. Deany did not check Rhodes to see if he were alive, but did radio his load supervisor, Lee Hastman, to report that a man was lying face down with blood and was in need of assistance.

At 5:48 a.m., Deany's train again stopped at the 75th and Exchange station, but Deany did not check to see if Rhodes was still there because he expected that the ICG police had taken care of him.

When Deany passed the 75th and Exchange station at 6:40 a.m., he saw Rhodes and again reported it to Hastman, who said that he had taken care of it. At 9 a.m. when he passed through the station, Deany learned that Rhodes was still in the waiting room. Deany did not report the incident again because he was headed for the Randolph Street station, where the incident was again reported.

Lee Hastman, the overnight load supervisor on November 29, 1986, testified that he received a call at 5:02 a.m. of a man lying in the waiting room. Hastman then contacted the ICG police dispatcher, who was Jerome Meehan.

Jerome Meehan testified that he called special agent Mark Krull when he received the call from Hastman shortly after 5:02 a.m. Krull told Meehan to call the Chicago police because he was busy with other duties. Meehan then contacted the Chicago police.

According to Meehan, dispatcher Nancy Wheeler received a call at 7:56 a.m. from James Carpenter, the load supervisor on duty, that a man was in the waiting room at the 75th and Exchange station. The conductor had reported that the man and floor were covered with blood. Upon receiving the report, Wheeler contacted the ICG special agent on duty, who was Richard Bilek. When Bilek told the dispatcher to call the Chicago police, Wheeler contacted the Chicago police.

Meehan stated that a third call came into the dispatcher's office around 9:45 a.m., stating that the man was covered with blood. Wheeler contacted Bilek, who said he was on his way and asked Wheeler to call the Chicago police, which she did.

Casimir Ziolkowski, the collector on Deany's train, testified that

the train stopped at the 75th and Exchange Street station at 5 a.m. Ziolkowski went with Deany to investigate a report that someone was lying in the waiting room. He could not see Rhodes' head or shoulders, which were under a bench. Although Ziolkowski did not check Rhodes, he did not think he was injured. At 5:40 a.m., Ziolkowski again saw Rhodes when the train passed through the 75th and Exchange station. At that time, Ziolkowski told the train engineer that Rhodes was still there.

Richard Bilek, an ICG police officer, testified that he received a call at 9:44 a.m. of an injured man at the 75th Street station. When Bilek arrived at the 75th and Exchange station at 10:11 a.m., he saw Rhodes lying face down on a bench in the waiting room. He did not see any blood, but did see beer cans two to three feet from Rhodes. Bilek woke up Rhodes, who appeared to be highly intoxicated, and asked if he had fallen or been beaten up. Bilek noticed cuts on Rhodes' swollen face and smelled alcohol on his breath and clothes. Rhodes had difficulty speaking. He nodded his head and spoke in a gravelly and groggy voice.

Bilek radioed the dispatcher to send the police to transport Rhodes to a hospital. After waiting awhile with Rhodes, Bilek called the dispatcher again. When the Chicago police arrived at 11:05 a.m., Rhodes was lying on the bench and could not be awakened. Rhodes was carried to the police squadrol and taken to Jackson Park Hospital.

Chicago police officer David Gomez and his partner, Officer John Gomez, testified that they were dispatched around 8 a.m. on November 29, 1986, to the 75th Street station, but left when no one from the ICG met them. At 11:05 a.m., they responded to a call that there was a drunk man at the 75th Street ICG station. After meeting Bilek at the entrance, they saw Rhodes lying on a bench. The officers saw minor abrasions on Rhodes' face, but did not remember seeing any blood. According to their report, Rhodes' wallet was found intact, but with no money.

Dr. Rolando Bautista, the on-call surgeon at Jackson Park Hospital on November 29, 1986, testified that Rhodes was in a coma when he was admitted to the emergency room at 11:25 a.m. Shortly after being admitted, Rhodes stopped breathing and was placed on a ventilator. After a series of tests, it was determined that Rhodes was brain dead. A CAT scan showed a massive subdural hematoma, which is a blood clot, on the left side of the brain.

Dr. Robert Kirschner, a forensic pathologist, performed the autopsy. Dr. Kirschner testified that Rhodes' lips and the left side of his face were bruised and swollen. In addition, there was a subgal-

leoal hemorrhage on the right side of the head, under the scalp but outside the skull. Inside the skull, there was a subdural hematoma on the left side of Rhodes' brain that caused the brain to swell and the brain stem to become herniated, causing a respiratory arrest. The hematoma was not visible from the outside.

According to Dr. Kirschner, the injuries were caused by more than one blow with a fist or hard object. The subgalleoal hemorrhage on the right side of the head was probably caused by Rhodes hitting his head on the ground. Dr. Kirschner concluded that Rhodes died on November 30, 1986, as a result of the subdural hematoma.

At trial, plaintiff asserted that even if Rhodes were a trespasser, the ICG owed him a duty of ordinary care because he was found in a place of danger. The trial court agreed. Accordingly, the trial court instructed the jury as follows:

"It was the duty of the defendant, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff's decedent. That means it was the duty of the defendant to be free from negligence."

After deliberating, the jury found defendant liable for Rhodes' death and awarded plaintiff $1.568 million in damages.

On appeal, defendant asserts that the trial court erred in determining as a matter of law that it owed Rhodes a duty of ordinary care. Defendant argues that there was no duty to provide aid to the injured Rhodes because there was no special relationship between Rhodes and the ICG. (See *Parra v. Tarasco, Inc.* (1992), 230 Ill. App. 3d 819, 822, 595 N.E.2d 1186.) Instead, defendant maintains that Rhodes was a trespasser, who was found drunk, surrounded by beer cans, and sleeping in the waiting room with no money, no ticket, and no apparent intention of boarding a train. Thus, defendant contends that the ICG owed Rhodes only the duty to refrain from willful and wanton conduct, which did not occur.

In response, plaintiff asserts that it cannot be determined as a matter of law that Rhodes was a trespasser. A trespasser is one who enters the premises of another with neither permission nor invitation and intrudes for some purpose of his own or at his convenience, or merely as an idler. (*Rodriguez v. Norfolk & Western Ry. Co.* (1992), 228 Ill. App. 3d 1024, 1038, 593 N.E.2d 597.) Plaintiff stresses that the trial court stated at the conclusion of the evidence:

"I don't think that there is enough evidence for the jury to decide or for the court to decide as a matter of law whether this individual was a trespasser or a patron. And I know that there is a strong argument that he was a trespasser, but there is no evidence, but his physical presence in that location I think entitles plaintiff [to] (an) inference that he could have been a patron."

Based on those comments, plaintiff argues that a common carrier is held to a standard of ordinary care toward its patrons, with regard to stations and other nonconveyance appurtenances. (*Brown v. Chicago Transit Authority* (1970), 123 Ill. App. 2d 145, 148, 260 N.E.2d 50.) Plaintiff argues that Rhodes was found in the area of the station where passengers wait for trains; Rhodes could have purchased a ticket from the train crew on the train even though there was no evidence that he had a passenger ticket in his possession; and it was not established who beat Rhodes where or what was removed from his clothing.

We agree with the trial court that there is scant evidence to discern whether the decedent was an invitee or a trespasser. From 5:02 a.m. until 11:05 a.m. when the Chicago police arrived at the scene, no one knew whether the injured man lying on the station floor was an invitee or a trespasser. Evidence is lacking as to whether the man had a ticket when he entered the train station and was subsequently beaten and robbed, or whether he was beaten before he entered the station and never had a ticket.

■ Although there is uncertainty as to whether the decedent was an invitee or a trespasser, we will for purposes of analysis assume that he was a trespasser. Generally, a landowner owes a trespasser only the duty to refrain from willfully and wantonly injuring him. (*Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 446, 605 N.E.2d 493.) However, an exception to that rule is that a landowner must use ordinary care to avoid injury to a trespasser who has been discovered in a place of danger on the premises. *Lee*, 152 Ill. 2d at 446; *Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 81 N.E.2d 866; *Rodriguez*, 228 Ill. App. 3d at 1038-39.

Defendant contends that the place-of-danger exception does not apply because the waiting room was not a place of danger and the condition of the waiting room did not cause Rhodes to suffer his fatal brain hemorrhage. In addition, defendant asserts that it had no independent duty to rescue Rhodes from his preexisting injury because a business like the ICG does not owe a duty to rescue a person who is already injured when he comes onto its property.

In response, plaintiff asserts that the ICG owed him a duty of reasonable care for his safety when it discovered he was injured and in need of assistance in its train station. Plaintiff stresses that the jury found that Rhodes was in need of assistance, the ICG failed to secure that assistance, and Rhodes died because of that failure.

Plaintiff relies on *Beverly Bank v. Penn Central Co.* (1974), 21 Ill. App. 3d 77, 79, 315 N.E.2d 110, where a security guard accidently shot a trespasser while pursuing him. The appellate court held that a

landowner owes to a trespasser the exercise of reasonable care for the trespasser's safety once his presence is known. (*Beverly Bank*, 21 Ill. App. 3d at 81.) Rejecting a narrow definition of a place of danger, the court stated that the place-of-danger exception has a flexible meaning. (*Beverly Bank*, 21 Ill. App. 3d at 81-82.) The court explained:

"[I]t means nothing more than to be in a position whereby the trespasser may be injured if the defendant does not exercise the proper degree of care. [Citation.] The duty in such a case is for the owner or occupier to exercise reasonable care in his actions for the discovered trespasser's safety." *Beverly Bank*, 21 Ill. App. 3d at 81-82.

Plaintiff also cites *Pridgen v. Boston Housing Authority* (1974), 364 Mass. 696, 308 N.E.2d 467, where an 11-year-old boy was injured when he was crushed by an elevator while trespassing in the elevator shaft. The court ruled that the property owner owed a trespasser a duty of reasonable affirmative action where he was physically entrapped in a position of peril. (*Pridgen*, 364 Mass. at 710-11, 308 N.E.2d at 477.) The Massachusetts Supreme Court rejected the idea that this duty can never be violated by nonfeasance: "The owner in such a situation is required to act if, in the same circumstances, an ordinary and reasonably prudent person would have acted." *Pridgen*, 364 Mass. at 711, 308 N.E.2d at 477.

Although *Pridgen* is not *stare decisis,* it is helpful. That court stated:

"In the context of the relationship between an owner or occupier (owner) of the property and a trapped, imperiled and helpless trespasser thereon, we reject any rule which would exempt the owner from liability if he knowingly refrains from taking reasonable action which he is in a position to take and which would prevent injury or further injury to the trespasser. It should not be, it cannot be, and surely it is not now the law of this Commonwealth that the owner in such a situation is rewarded with immunity from liability as long as he ignores the plight of the trapped trespasser and takes no affirmative action to help him. ***

*** [W]e are dealing with one who is injured after his original trespass is effectively frustrated by virtual physical entrapment in a position of peril. We hold that as to the latter trespasser the owner owes a duty to exercise reasonable care to prevent injury or further injury to him, including, if necessary, the duty to take reasonable affirmative action." *Pridgen*, 364 Mass. at 711-12, 308 N.E.2d at 476-77.

In *Lee,* the Illinois Supreme Court discussed public policy considerations in cases where trespassers are injured. The trespasser

in *Lee* was electrocuted when he wandered from the public sidewalk onto the Chicago Transit Authority's (CTA's) railroad tracks, apparently to urinate. (*Lee*, 152 Ill. 2d at 443.) In holding that the CTA owed the trespasser a duty of ordinary care to properly warn of the third rail, the court stated:

> "We recognize that our holding today represents a slight departure from the traditional rule regarding the duty owed to trespassers. However, '[i]n the choice of competing considerations of societal policy, the need for protection against the reasonably foreseeable risk of death or severe personal injury outweighs the freedom of action that would otherwise characterize the relation of the possessor of land to a trespasser.' [Citation.] Our determination of the existence of a duty here, we believe, is properly reflective of the prevailing social policies.
>
> Moreover, the legal concept of duty is not sacrosanct in itself. [Citation.] Though the existence of a legal duty is ordinarily considered in terms of foreseeability of injury, the question of whether a legal duty exists is contingent upon a variety of factors. [Citation.] Considerations such as the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden upon the defendant must be taken into account. [Citations.] Thus, duty is no more than an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Lee*, 152 Ill. 2d at 452-53.

■ In accordance with *Beverly Bank* and the public policy considerations discussed in *Lee*, we conclude that even if it is assumed that Rhodes was a trespasser, the ICG owed him a duty of ordinary care once it discovered him in a position of danger. Rhodes was lying in the ICG's waiting room. There was blood around his head and he was obviously in need of assistance. Once the ICG discovered him in that condition, it owed him the duty to use reasonable care in its actions for his safety. Finding someone with blood around his head would indicate that letting him lie unattended would probably and foreseeably cause him further harm.

Since Rhodes was imperiled and helpless, the ICG cannot be exempt from liability if it knowingly refrained from taking reasonable action it was in a position to take and which would prevent further injury to Rhodes. To decide otherwise would reward the ICG with immunity from liability as long as it ignores the plight of an imperiled trespasser and takes no affirmative action to help him. Thus, we hold that the ICG owed a duty to exercise reasonable care to prevent further injury to Rhodes, including the duty to take reasonable affirmative action.

Moreover, we note that in addition to owing Rhodes a duty of ordinary care under the position of danger doctrine, the ICG also owed Rhodes a duty of care under the voluntary undertaking theory. Liability can arise from the negligent performance of a voluntary undertaking. (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74, 199 N.E.2d 769.) One who voluntarily undertakes a course of action may not perform the act negligently. (*Frye v. Medicare-Glaser Corp.* (1992), 153 Ill. 2d 26, 29, 605 N.E.2d 557.) The duty, however, is limited to the extent of the undertaking. (*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 210, 399 N.E.2d 596.) Public policy warrants a narrow construction of a voluntary undertaking. (*Frye,* 153 Ill. 2d at 29.) In *Nelson,* the court used the voluntary undertaking theory to impose liability against an insurer for personal injuries suffered as a result of the insurer's negligent performance of a gratuitous inspection of the premises. (*Nelson,* 31 Ill. 2d 69, 199 N.E.2d 769.) The supreme court stated:

"It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Nelson,* 31 Ill. 2d at 86.

In addition, section 323 of the Restatement (Second) of Torts states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm." Restatement (Second) of Torts, § 323 (1977).

■ In this case, the ICG voluntarily took action when Rhodes was found lying on its waiting room floor. After the train conductor found Rhodes, he called his supervisor, who called the dispatcher, who contacted the Chicago police. Under the voluntary undertaking theory, the ICG had a duty to use reasonable care in obtaining assistance. It negligently performed its voluntary undertaking by not following up after learning that the Chicago police did not come to the waiting room. As a result, the harm to Rhodes was reasonably probable and foreseeable.

In summary, we hold that the ICG owed Rhodes a duty of ordinary care even if he were a trespasser because he was in a place of danger. Furthermore, the ICG also had a duty to use reasonable care in obtaining assistance which was voluntarily undertaken.

Accordingly, we affirm the circuit court judgment.

Affirmed.

RIZZI and GREIMAN, JJ., concur.