(No. 78667.—

CORA LEE RHODES, as Special Adm'r of the Estate of Carl Rhodes, Deceased, Appellee, v. ILLINOIS CENTRAL GULF RAILROAD, Appellant.

*Opinion filed March 28, 1996.—Rehearing denied June 3, 1996.*

214

Stephen C. Carlson and James E. Taylor, of Sidley & Austin, of Chicago (Michael Noland, of counsel), for appellant.

Jerome Mirza & Associates, Ltd., of Chicago (Jerome

Mirza and Eileen M. O'Sullivan, of counsel), for appellee.

Power, Rogers & Smith, P.C., of Chicago (Ruth M. Degnan and Devon C. Bruce, of counsel), for *amicus curiae* Illinois Trial Lawyers Association.

Phelan, Cahill & Quinlan, Ltd., of Chicago (William R. Quinlan and Mary Patricia Benz, of counsel), for *amicus curiae* Chicago Transit Authority.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

The plaintiff, Cora Lee Rhodes, as special administrator of the estate of Carl Rhodes, deceased, brought this action in the circuit court of Cook County seeking damages for Carl's death from the defendant, Illinois Central Gulf Railroad (ICG). The plaintiff charged that ICG should be held liable for failing to provide assistance to Carl when he was found injured in an unmanned ICG train station. Following a trial, the jury found in favor of the plaintiff and awarded $1,568,000 in damages. The trial court entered judgment on the verdict. The appellate court affirmed. 268 Ill. App. 3d 589. We allowed ICG's petition for leave to appeal. 145 Ill. 2d R. 315. The Illinois Trial Lawyers Association was granted leave and filed a brief *amicus curiae* in support of the plaintiff. The Chicago Transit Authority was granted leave and filed a brief *amicus curiae* in support of the defendant. 134 Ill. 2d R. 345(a).

## FACTS

The testimony at trial revealed that, at approximately 5 a.m. on Saturday, November 29, 1986, an ICG commuter train stopped to pick up passengers at 75th Street and Exchange Avenue in Chicago. The station at this stop is unmanned and consists of a "warming

house," a room in which passengers may wait for the train. Raymond Deany, the conductor of the train, testified that a passenger boarding the train at this stop informed him that someone was lying in the warming house. In response, Deany and the collector, Casey Ziolkowski, left the train and stepped into the doorway of the warming house. Deany saw a man, later identified as Carl Rhodes, lying face down on the floor. Deany observed a "minute amount" of blood "smeared" on the floor around the man's head, but saw no blood on the man himself. Ziolkowski testified that he observed a man lying on the floor, but did not see any blood, either on or around the man. Ziolkowski testified that the man did not appear to be injured or in distress. He did not observe the man more closely to check for injuries because he was concerned he might have been injured or robbed by the man.

Deany and Ziolkowski returned to their train. In accordance with ICG procedure, Deany called on his radio to Lee Hastman, his "load supervisor," and reported that he had observed a man lying in the warming house with blood and that the man needed assistance. Deany testified that the man needed assistance to "get out of the warming house because he was not supposed to be there." Deany explained that he made his report because a man was sleeping in the warming house, an activity which ICG did not allow. Deany's train then continued on its way.

Cora Rhodes, Carl's mother, testified that the last time she saw Carl alive was at home at approximately 2:30 or 3 a.m. on November 29, 1986. He had been out with friends when he stopped back at home for a few minutes and then left again. Carl was then 18 years of age and in his first semester of college.

Eugene Owens, a long-time friend of Carl Rhodes, testified that he attended a party with Carl on the eve-

ning of November 28, 1986. Owens stated that Carl became "extremely intoxicated" and a "nuisance" at the party. At approximately midnight or 1 a.m., Owens was with Carl and several others at a gas station located at 79th and Yates in Chicago. Carl left the gas station with a man named Rod. When he left, Carl was carrying a significant sum of money and stated that he wanted to buy more alcohol. Owens testified that it is approximately one mile from the gas station at 79th and Yates to the ICG station at 75th and Exchange. There was also testimony that Carl's home was approximately one mile from the 75th Street station.

David Moore, another long-time friend of Carl, testified that he was with Carl and some other friends drinking alcohol on the evening of November 28, 1986. At some point, they went to Carl's house, where Carl obtained some money, which he told them was his financial aid money. The group then purchased more beer. In Moore's opinion, Carl became intoxicated. At approximately 1 a.m., Moore witnessed Carl and Eugene Owens get into an argument which led to a tussle between the two. Owens slapped Carl around and threw him on the hood of the car, causing Carl to bump his head. Moore last saw Carl at approximately 1:30 or 1:45 a.m. at the gas station. Carl refused to ride home with Moore and the others. In Moore's opinion, Carl was intoxicated at that time.

Rodney Latham, another long-time friend of Carl, testified that he first came upon Carl on November 29, 1986 at approximately 2 a.m. at the gas station at 79th and Yates. He and Carl began walking toward 79th and Crandon, the block on which they both lived. Latham testified that Carl was not staggering, and he could not tell if he had been drinking. While they were walking, a stranger came up and Carl asked the stranger if he knew where a liquor store was located. Carl and the

stranger then walked away from Latham. No further evidence was introduced regarding Carl's whereabouts until he was discovered at 5 a.m. in the ICG warming house.

ICG load supervisor Lee Hastman testified that he received a report from conductor Deany's train at 5:02 a.m. of a man lying in the warming house. Hastman immediately transmitted this information to ICG police dispatcher Jerome Meehan. Meehan testified that he received Hastman's call at around 5 a.m. and that nothing in this report suggested that any serious illness was involved. In accordance with ICG procedure, Meehan immediately contacted the patrolman on duty, Mark Krull, via radio, and relayed the report. Krull was engaged in the task of opening ICG's Van Buren station and instructed Meehan to contact the Chicago police department. Meehan contacted the Chicago police department at 5:02 a.m. and relayed the report he had received from Hastman. As of that time, Meehan had never known the Chicago police to fail to respond when he called them for assistance.

Conductor Deany's train again stopped at 75th and Exchange at approximately 5:48 a.m. Collector Ziolkowski looked out from the train at this time and saw that the man was still lying in the warming house. Ziolkowski reported this to the train engineer, Lavonne Blaylock.

Conductor Deany's train next stopped at 75th and Exchange at about 6:40 a.m. Deany looked out the window and saw the man lying there. Deany called on his radio to load supervisor Hastman to report that the man was still there. Hastman told Deany that he had taken care of the situation.

At 7:56 a.m., a conductor from another train passing through the station called on the radio to report that a man was sleeping in the warming house. James Carpen-

ter, the load supervisor now on duty, received the report and relayed the information to the ICG police dispatcher. Carpenter testified that the load supervisor's office receives a lot of reports of persons lying in warming houses and that such calls are a routine matter in the wintertime. ICG police dispatcher Nancy Wheeler confirmed that it was very common for ICG to receive reports of persons sleeping in the warming houses. If a person were found sleeping in a warming house, the ICG procedure was to have him removed, either by ICG police or the local municipality's police.

In response to Carpenter's call, dispatcher Wheeler called on the radio to ICG patrolman Richard Bilek, the patrolman then on duty. Bilek, however, was busy and instructed Wheeler to call the Chicago police department. Bilek testified that he had been engaged since the start of his 7 a.m. shift performing a number of his police duties, including providing security while ticket vending machines were serviced. After speaking to Bilek, Wheeler called the Chicago police and relayed the report. In Wheeler's experience, the Chicago police responded when ICG police requested assistance.

Chicago police officers David Gomez and John Gomez testified that they were dispatched to meet an ICG police unit somewhere in the vicinity of 75th Street, Exchange and Saginaw at approximately 8 a.m. They went to that location. It was their understanding that an ICG police unit was to meet them there, and finding no such unit, they left without entering the station. There was no evidence that anyone from ICG told the Chicago police that an ICG representative would meet the Chicago police at the station.

At 9 a.m., conductor Deany's train again stopped at the 75th and Exchange station. A passenger boarding the train informed Deany that a man was in the warming house who appeared to be sleeping and was snoring.

Deany did not report this information by radio to the load supervisor because he had already reported the man twice. Collector Ziolkowski testified that, at the end of his shift at 9:30 a.m., he went into the load supervisor's office and asked him if anything had been done about the man lying in the warming house. Ziolkowski testified that he was "kind of surprised" and "curious" that the man was still there. Records indicated that an engineer from one of the commuter trains, possibly Blaylock, also relayed a report to load supervisor Carpenter at about this time. This report stated, referring to the man in the 75th and Exchange warming house, that the man and the floor were "covered" with blood. Carpenter testified that he immediately called the ICG police dispatcher and relayed this report.

Dispatcher Wheeler testified that she received a call from the load supervisor at approximately 9:44 a.m. of an injured person at the 75th Street station. In response, Wheeler immediately contacted patrolman Bilek and the Chicago police.

Patrolman Bilek was at the Randolph station when Wheeler contacted him at 9:44 a.m. Bilek immediately drove to the 75th Street station, arriving at 10:11 a.m. Upon entering the warming house, Bilek saw a man lying on a bench. Bilek attempted to awaken the man, and the man responded by sitting up on the bench with Bilek's assistance. Bilek noticed bruising and one or two cuts on the man's face and that his face was somewhat swollen. The facial cuts were not bleeding, and Bilek saw no blood on the man or on the floor or walls. Bilek saw beer cans lying near the man. Bilek, who had been employed as either a municipal or an ICG police officer since 1972, determined that the man was highly intoxicated because of the smell of alcohol on his breath and clothing.

Bilek asked the man if he had been beaten up or

had fallen. The man responded slowly to Bilek, nodding and speaking in a groggy voice. Bilek believed that his manner of responding was consistent with being intoxicated. Bilek told the man that, because he was highly intoxicated, he was going to have him transported to the hospital. Bilek then radioed the ICG police dispatcher and asked her to send the Chicago police to transport the man to the hospital. Bilek waited with the man for the police, making sure the man did not injure himself. When two Chicago police officers arrived, Bilek and the officers attempted to awaken the man but could not do so. The three men carried the man to the police vehicle. Bilek's report of the incident indicated that the man was not "authorized on property" and that his condition was "highly intoxicated." The narrative portion of Bilek's report recounted that "[s]ubject had been drinking in station, fell a number of times injuring face, taken by Chicago police to Jackson Park Hospital for treatment."

Chicago police officers John Gomez and David Gomez testified that they arrived at the 75th Street station at 11:05 a.m. Bilek met them and led them to a man who was snoring heavily. Officer David Gomez saw five or six beer cans around the man and believed the man was intoxicated. Officer John Gomez stated that, according to his report, they were responding to a call about a "down drunk." His report indicated that the subject was intoxicated with no visible injuries other than small abrasions on his face. The narrative section of his report stated the man was "lying face up snoring heavily with empty and partially [sic] beer cans surrounding victim," and that the officers "observed minor abrasions of the face and transported to [Jackson Park] Hospital for treatment." The man had no money in his wallet.

Jackson Park Hospital records indicate that Carl was brought into the emergency room at 11:25 a.m. The

records state that his face was swollen and bruised and there was discolored blood around his nose and eyelids. He was unresponsive and was snoring with gurgling respirations. Soon after his arrival, he stopped breathing and was intubated. Neurological tests indicated that he had suffered an injury to his brain. A "CT" (computerized tomography) scan was performed several hours later, the results of which showed a massive subdural hematoma (a collection of blood under the dura matter covering the brain) on the left side of his brain. However, the records reveal that Carl had no corresponding visible injury to the external surface of his scalp. Carl died the following day at Jackson Park Hospital.

Dr. Robert Kirschner, the pathologist who performed the autopsy on Carl's body, testified that the cause of death was a subdural hematoma, likely the result of an assault. According to Dr. Kirschner, a subdural hematoma such as this cannot be seen without opening the person's scalp. Carl's body revealed no injury to the external surface of the scalp.

Dr. Thomas Stilp, a neurosurgeon, testified as an expert for the plaintiff that Carl was in a coma when he reached the hospital emergency room, the cause of which was an acute subdural hematoma. Once Carl went into respiratory arrest, in Dr. Stilp's opinion, he was beyond being helped by any medical treatment. Dr. Stilp opined that, had Carl undergone surgery to relieve the hematoma while he was still communicating, he would more probably than not have had a "good recovery." Dr. Stilp agreed that Carl's head injury was a closed injury and that there was no injury present on the external surface of his scalp.

Dr. Marshall Matz, a neurosurgeon, testified as an expert for the defense that 60% to 75% of persons who sustain acute subdural hematomas do not survive, and of those that do survive, only a "small percentage"

return to normal neurological function. Dr. Ron Lee, an emergency room doctor testifying as a defense expert, stated that it would be difficult to identify an intracranial injury, such as that suffered by Carl, without a medical examination. In Dr. Lee's opinion, based upon the injuries that were noted at the hospital and the description of Carl's condition given by the train crew, the train crew could not have known the severity of Carl's injury.

Mitch Markovitz testified for the defense as an expert regarding the appropriate conduct of commuter train crews in the Chicago area. Markovitz testified that, based upon his 25 years of experience in this area, it is common for conductors to learn that a person is lying or loitering in an unmanned warming house. The conductor and/or collector should report the matter, but should not try to awake or arouse the person, due to the possibility of being injured or robbed. In Markovitz's opinion, Deany and Ziolkowski acted correctly in their handling of the situation in this case. The evidence at trial also showed that the temperature in the early morning hours of November 29, 1986, was approximately 30 degrees Fahrenheit.

During the course of the trial, ICG argued that Carl was a trespasser on ICG's premises and that, as a result, ICG owed him only a duty to refrain from willfully and wantonly injuring him. The trial judge ruled that Carl's status as an invitee or a trespasser on ICG's premises was not relevant because the duty owed by ICG to Carl would be the same in either case—to exercise ordinary care for Carl's safety. The trial judge reached this conclusion by accepting the plaintiff's argument that, even if Carl was a trespasser, he fell into an exception to the general rule applicable where a trespasser is discovered by the landowner in a "place of danger."

Following the presentation of evidence and closing

arguments, the jury was instructed that ICG had the duty "before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff's decedent. That means it was the duty of the defendant to be free from negligence." The trial court further instructed the jury that, according to the plaintiff, ICG was negligent because it "observed the decedent lying injured on the property of the defendant but failed to further investigate or to provide assistance or attend to the decedent for an unreasonable period of time." Due to the trial judge's ruling on the invitee/trespasser issue, the jury was not required to decide the issue of Carl's status on ICG's premises. After deliberating, the jury returned a verdict in favor of the plaintiff and awarded damages in the amount of $1,568,000. ICG's post-trial motion was denied, and ICG appealed.

The appellate court upheld the jury's verdict on two grounds. Initially, the appellate court noted that "[a]lthough there is uncertainty as to whether the decedent was an invitee or a trespasser, we will for purposes of analysis assume that he was a trespasser." 268 Ill. App. 3d at 594. The appellate court went on to hold that Carl fit within the "place of danger" exception to the general rule that a landowner owes a trespasser only the duty to refrain from willfully and wantonly injuring him. Thus, the appellate court concluded that the jury was properly instructed. 268 Ill. App. 3d at 596. As an alternate ground for upholding the jury verdict, the appellate court held that ICG could be held liable under the theory that ICG voluntarily undertook to provide aid to Carl and did so negligently by failing to "follow up" on the Chicago police department's response to its calls. 268 Ill. App. 3d at 597.

## ANALYSIS

ICG contends that reversal of the jury verdict in favor of the plaintiff is required because the jury was

improperly instructed on the duty owed to Carl by ICG. We agree that the jury was not properly instructed as to ICG's duty in this case and, on that basis, we reverse and remand for a new trial.

In order to succeed in a negligence action, the plaintiff must prove a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from that breach. *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991). Whether a duty exists is a question of law for the court to decide. *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 542 (1991). In resolving whether a duty exists, a court must determine whether there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other. *Vesey*, 145 Ill. 2d at 411; *Gouge*, 144 Ill. 2d at 542.

ICG contends that Carl was a trespasser on ICG's premises and that the trial court incorrectly instructed the jury on ICG's duty, as a landowner, to Carl, as a trespasser. The plaintiff argues that the jury could have found that Carl was a patron, and thus an invitee, on the premises, because he was using the warming house for the purpose of waiting to board a train. ICG does not challenge the trial court's instruction of the jury if Carl was an invitee on the premises. We therefore do not consider whether ICG's duty in this case was correctly stated if Carl was an invitee. The only duty question we are called upon to decide is whether the trial court correctly instructed the jury as to ICG's duty if Carl was a trespasser.

I.

Duty Under Premises Liability

The plaintiff here charged ICG with liability for Carl's death in its capacity as the owner of the station and warming house. Illinois law imposes a duty upon

premises owners and occupiers which varies with regard to the plaintiff's status on the premises. *Lee v. Chicago Transit Authority,* 152 Ill. 2d 432, 446 (1992). Entrants upon land are divided into three classifications: invitees, licensees, and trespassers. An invitee is defined as one who enters the premises of another with the owner's or occupier's express or implied consent for the mutual benefit of himself and the owner, or for a purpose connected with the business in which the owner is engaged. *Rodriguez v. Norfolk & Western Ry. Co.,* 228 Ill. App. 3d 1024, 1038 (1992). A licensee is one who enters upon the premises of another with the owner's or occupier's express or implied consent to satisfy his own purpose. *Rodriguez,* 228 Ill. App. 3d at 1038. A trespasser is one who enters upon the premises of another with neither permission nor invitation and intrudes for some purpose of his own, or at his convenience, or merely as an idler. *Rodriguez,* 228 Ill. App. 3d at 1038.

The duty owed to a licensee differed from that owed to an invitee under common law; however, since the enactment of the Premises Liability Act (740 ILCS 130/1 *et seq.* (West 1994)) that distinction has been eliminated. Under the Premises Liability Act, the duty owed by a premises owner or occupier to an invitee or a licensee is that of "reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." 740 ILCS 130/2 (West 1994). Our analysis in this case is only concerned, however, with the duty owed by a landowner to a trespasser.

## A.

### Landowners' Duty to Trespassers

Although the Premises Liability Act abolished the common law distinction between the duties owed by a landowner to an invitee and a licensee, the Act expressly retained the distinction between the duties owed to

those lawfully on the premises (invitees and licensees) and those unlawfully on the premises (trespassers). See 740 ILCS 130/3 (West 1994). In general, a landowner owes no duty of care to a trespassing adult except to refrain from willfully and wantonly injuring him. *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110 (1995); *Marcovitz v. Hergenrether*, 302 Ill. 162, 167 (1922); see *Skoczylas v. Ballis*, 191 Ill. App. 3d 1, 4 (1989). The rationale for this rule is that "in a civilization based on private ownership, it is considered a socially desirable policy to permit a person use of his land in his own way, without the burden of watching for and protecting those who come there without permission or right." *Mt. Zion State Bank*, 169 Ill. 2d at 122.

A number of exceptions to the general rule limiting the landowner's duty to trespassers have been created, however. See *Lee*, 152 Ill. 2d at 446. One such exception imposes upon a landowner or occupier the duty to use ordinary care to avoid injury to a trespasser who has been discovered in a "place of danger" on the premises. *Lee*, 152 Ill. 2d at 446; *Briney v. Illinois Central R.R. Co.*, 401 Ill. 181, 186 (1948). The plaintiff argues that Carl comes within this exception because he was a trespasser discovered on the premises in a "place of danger."

ICG responds that this exception does not apply here because Carl, though admittedly "discovered" by ICG, was not discovered in a "place of danger" on the premises. For the reasons that follow, we reject the application of the "place of danger" exception to this case.

B.

*"Place of Danger" Exception*

The plaintiff does not contend that Carl's head injury was caused by a condition of ICG's premises or by any

activities conducted thereon by ICG. Nor does the plaintiff argue that Carl, by virtue of his presence on the premises, was in any danger of being injured by a condition or activity on the premises, such as a moving train or a high voltage rail. Rather, the only basis advanced for a finding that Carl was discovered in a place of danger on ICG's premises is the fact that Carl was discovered on the premises in an injured condition. The place of danger exception does not arise simply because a trespasser is discovered in an injured state on the landowner's premises.

The place of danger exception is a premises liability concept which defines when a property owner or occupier can be held liable for injuries that a trespasser suffers as a result of a condition or activity on the property. A place of danger thus denotes a place which, by reason of a condition or activity on the premises, risks harm to anyone who is present, whether previously injured or not. It must be the condition or activity on the land that makes it a place of danger, not the mere presence of a person in an injured state. For instance, a trespasser discovered by a railroad on the tracks in the path of the railroad's moving train would properly be considered to be in a place of danger such that the railroad owed him a duty of ordinary care to avoid injury to him. See *Higgins v. Baltimore & Ohio R.R. Co.*, 16 Ill. App. 2d 227, 230 (1958).

To accept the plaintiff's interpretation would render all premises places of danger once an injured trespasser arrives there. Moreover, a place of danger would move wherever the injured trespasser happened to move, regardless of the condition of the premises and the degree of caution taken by the owner to prevent injury to others on the property. An otherwise safe place could alternatively be both a place of danger and not a place of danger as an injured trespasser moves back and forth across the property line.

Here, Carl was not discovered in a place on ICG's premises where a condition or activity on the premises posed a danger to him. To the contrary, Carl was discovered in what must be considered the relatively safe location (given that the outside temperature was below freezing) of the ICG warming house. We do not agree that this safe location was transformed into a place of danger by the mere fortuity that an injured trespasser came to rest there.

In sum, we reject the plaintiff's contention that the "place of danger" exception is applicable to this case. If Carl was a trespasser, the only duty owed to him by ICG under a premises liability theory was the duty to refrain from willfully and wantonly injuring him. The trial court therefore erred in holding that ICG owed a duty of ordinary care to Carl even if he was a trespasser on ICG's premises.

## C.

### *Application to Present Case*

We further find, however, that the duties owed by a landowner under a premises liability theory, though relied upon by the parties, are not implicated in this case. While ICG, as the landowner, owed Carl, as a trespasser, the duty to refrain from willfully and wantonly injuring him, there is no allegation, or evidence, in this case that would support recovery for the plaintiff under that theory. There is no evidence that any condition or activity on ICG's premises caused Carl's injury. Thus, ICG may not be found liable for Carl's death on the theory that it willfully and wantonly injured Carl by failing to maintain its premises in a safe condition or by conducting an activity on its premises. Simply put, premises liability theories do not provide a basis for recovery against ICG in this case because neither ICG nor its premises caused Carl's injury.

Rather, the plaintiff's only theory of liability against ICG is that ICG had a duty to take some affirmative action to aid Carl because Carl was discovered injured on ICG's premises. The issue we must therefore address is whether, under the facts of this case, a duty arose on the part of ICG to take some affirmative action to aid Carl once he was found injured on ICG's premises. See *Parra v. Tarasco, Inc.*, 230 Ill. App. 3d 819, 822 (1992) (where plaintiff charged restaurant with liability for failing to aid choking customer, court notes that case "differs substantially from premises liability cases involving patrons injured in restaurants"). Again, because ICG does not challenge the imposition of this duty upon it if Carl was an invitee, our analysis is limited to determining whether this duty was owed if Carl was a trespasser.

## II.

### Duty to Rescue

Our common law generally imposes no duty to rescue an injured stranger upon one who did not cause the injury in the first instance. See *Handzel v. Kane-Miller Corp.*, 244 Ill. App. 3d 244, 246 (1993); *Parra v. Tarasco, Inc.*, 230 Ill. App. 3d 819, 822 (1992); *Jackson v. City of Joliet*, 715 F.2d 1200, 1202 (7th Cir. 1983); see also Restatement (Second) of Torts § 314 (1965) (the general rule is that the mere fact that an actor realizes or should realize that his action is necessary for the aid of another, while perhaps imposing a moral duty to act, does not in itself impose a legal duty to act). A duty to take some affirmative action to aid another may arise, however, where a special relationship exists between the parties. *Parra*, 230 Ill. App. 3d at 822; *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 859 (Tenn. 1985).

We must therefore determine whether a special re-

lationship existed between Carl, as a trespasser, and ICG, as a landowner, such that a duty to take some affirmative action to aid Carl should be imposed on ICG. ICG contends that Illinois law does not impose on landowners a duty to take affirmative action to aid injured trespassers. We agree that Illinois law does not support the imposition of such a duty.

As noted, a trespasser is one who enters upon the premises of another with neither permission nor invitation and intrudes for some purpose of his own, or at his convenience, or merely as an idler. *Rodriguez*, 228 Ill. App. 3d at 1038. The trespasser is thus on the defendant's premises for a purpose that is not allowed by the defendant and, therefore, does not benefit the defendant.

We can discern no special relationship between a landowner and a trespasser which justifies the imposition of a duty on the landowner to take action to aid an injured trespasser where it would not otherwise exist. Where a trespasser is not injured by a condition on the defendant's premises nor by any conduct on the defendant's part, but simply comes to rest on the defendant's property in an injured state, there is no rational reason for holding that a special relationship exists between the two parties which imposes a duty on one to take affirmative action to rescue the other. The only "relationship" between the parties is the wholly fortuitous circumstance of the trespasser's unlawful presence on the premises.

The arbitrariness of using an injured trespasser's mere presence on the defendant's premises as justification for imposing a duty to rescue is evident. Employing such a rule, a homeowner who finds an injured, drunken stranger lying on his lawn has a legal duty to rescue, but the homeowner who sees his next-door neighbor drowning is under no such legal obligation. In fact, the

duty to take action or not to take action would vary as an injured trespasser staggered back and forth across the homeowner's property line. The imposition of a duty to aid would thus turn on a wholly arbitrary circumstance.

Neither the plaintiff, nor the appellate court, has offered any persuasive rationale for holding that the relationship between a landowner and a trespasser is one which justifies the imposition of a duty to rescue upon the landowner. The appellate court simply stated that "[t]o decide otherwise would reward the ICG with immunity from liability as long as it ignores the plight of an imperiled trespasser." 268 Ill. App. 3d at 596. Speaking in terms of granting "immunity," however, is inappropriate here. The general rule is that there is no legal duty to rescue an injured stranger. Thus, the landowner is not being rewarded with immunity but, rather, is being held to the standard imposed upon persons in general who encounter an injured stranger.

The parties have not invited us to disregard the long-standing general rule that there is no duty to take affirmative action to aid an injured stranger. Certainly, the impracticality of imposing a legal duty to rescue between parties who stand in no special relationship to each other would leave us hesitant to do so. Our law recognizes that, while persons may owe a *moral* duty to take affirmative action to help a fellow human being in distress, legal liability for failing to do so should not be imposed. As noted by Prosser and Keeton, discussing the continued adherence of the common law to the general rule:

> "the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue one, has limited any tendency to depart from the rule to cases where some special relation between the parties has afforded a justification for the creation of a duty,

without any question of setting up a rule of universal application." W. Keeton, Prosser & Keeton on Torts § 56, at 376 (5th ed. 1984).

In this same vein, another writer has remarked,

"[i]t may be that [a general rule imposing a duty to rescue] involves a risk of making goodhearted people liable without fault, as where a timid automobilist is sued for refusing to pick up a 'thummer,' who in fact needs help or where a swimmer drowns in full view of unobservant, or perhaps, stupid people." W. Seavey, *I am Not My Guest's Keeper*, 13 Vand. L. Rev. 699, 702 (1960).

Likewise, principles of morality may dictate that a landowner take steps to rescue a trespasser found injured on his premises, but legal liability should not flow from the failure to do so. We cannot accept the plaintiff's suggestion that we should be swayed by the fact that ICG was a business, rather than a private, landowner. The rule here sought by the plaintiff, imposing a duty on ICG to rescue Carl simply because he was discovered injured on ICG's property, would apply to *all* landowners, including private homeowners, because the only required relationship with the landowner is the trespasser's presence on the property. We are not persuaded that we should adopt a rule which could render a homeowner liable to an injured, drunken stranger who comes to rest on the homeowner's lawn.

The plaintiff relies on *Beverly Bank v. Penn Central Co.*, 21 Ill. App. 3d 77 (1974), in support of the contention that ICG owed a duty to provide aid to Carl, even if he was a trespasser. That decision does not support the imposition of the duty sought in this case. *Beverly Bank* did not involve an alleged failure to provide aid or rescue to an injured trespasser but, rather, involved alleged liability for a defendant's own conduct in injuring a trespasser. In that case, the plaintiff sued a railroad for injuries sustained when, while the plaintiff and others were attempting to steal merchandise from a railroad car, a shotgun held by a railroad security guard

accidently discharged and wounded the plaintiff. The *Beverly Bank* court, though ultimately holding that the plaintiff was barred from recovering due to a jury finding that he had been guilty of contributory willful and wanton misconduct, held that the railroad owed the plaintiff a duty of "ordinary care" because he fell into the category of a trespasser discovered in a place of danger. *Beverly Bank*, 21 Ill. App. 3d at 81. *Beverly Bank* is clearly distinguishable on its facts from this case. Here, there is no claim that ICG caused an injury to Carl, only that it failed to rescue him from a preexisting injury. Thus, without commenting on the correctness of the *Beverly Bank* decision as it defines place of danger, we find that decision to be entirely inapplicable to the present case.

The plaintiff also cites to a Massachusetts case, *Pridgen v. Boston Housing Authority*, 364 Mass. 696, 308 N.E.2d 467 (1974), in support of imposing a duty on ICG to rescue an injured trespasser. *Pridgen* involved an 11-year-old trespasser who, after he became trapped in an elevator shaft in the defendant's building, was struck and injured by the moving elevator. The plaintiff charged the defendant with negligence in that, knowing of the child's entrapment, the defendant failed to turn off the power to the elevator. *Pridgen* is factually distinguishable. There, a condition on the defendant's premises, the moving elevator, caused the plaintiff's injury. We note that there is language in the *Pridgen* decision suggesting that Massachusetts should impose an affirmative duty on premises owners and occupiers to rescue a "trapped, imperiled and helpless trespasser." As discussed, however, we do not agree that a legal duty should be imposed on landowners to take affirmative action to rescue injured trespassers.

We thus hold that a landowner or occupier does not owe a duty to take affirmative action to aid an injured

trespasser whose injury is not caused by the landowner or his premises. We note again that, because it has not been raised as an issue in this case, we do not here decide whether the relationship between a landowner and one lawfully on his premises would give rise to a duty to take affirmative action to aid. We leave that question for a case in which the issue has been properly raised and we have the benefit of the parties' briefs and arguments on the issue.

Accordingly, we hold that, if Carl was a trespasser on ICG's premises, ICG may not be charged with the duty to take affirmative action to obtain aid for him. If Carl was a trespasser, the trial court erred in instructing the jury that ICG could be held liable if it "observed the decedent lying injured *** but failed to further investigate or to provide assistance or attend to the decedent." Thus, because the trial court's instruction of the jury as to ICG's duty if Carl was a trespasser was incorrect, we reverse the jury's verdict and remand this case for a new trial. On retrial, the jury must decide if Carl was a patron (invitee) or a trespasser on the premises and must be further instructed in accordance with this opinion.

## III.

### ICG's Procedures

The plaintiff also contends that, even if the law imposed no duty on ICG to take affirmative action to aid Carl, such a duty was created by ICG's own procedures. The plaintiff points to no written policy manual or handbook as the source for this contention, but relies on the trial testimony of ICG employees. Specifically, the plaintiff points to testimony from various ICG employees to the effect that, where a person was reported injured in a warming house, the procedure was to send both the local municipality's police and an ICG patrol-

man to the scene. As ICG points out, the testimony as to ICG's procedure was far from clear, with some testimony indicating that the procedure was to send an ICG patrolman if he was available and, if he was unavailable, to send the local police. Regardless, even if the plaintiff's interpretation of ICG's procedure is accepted, the plaintiff's contention fails.

Whether a legal duty exists is a question of law and is determined by reference to whether the parties stood in such a relationship to each other that *the law* imposes an obligation on one to act for the protection of the other. *Gouge*, 144 Ill. 2d at 542. Where the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines. Rather, it is the law which, in the end, must say what is legally required. See *Blankenship v. Peoria Park District*, 269 Ill. App. 3d 416, 422 (1994) (park district's internal rules requiring one lifeguard to remain on duty at all times did not create a legal duty to have one lifeguard on duty); *Fillpot v. Midway Airlines, Inc.*, 261 Ill. App. 3d 237, 244 (1994) (where airline owed no legal duty to remove snow or ice, airline's policy manual requiring the clearing of walkways did not create such a duty); *Mattice v. Goodman*, 173 Ill. App. 3d 236, 240 (1988) (where building owners owed no legal duty to assist elderly person through door, no such duty was created by building owner's employment of an employee who, in accordance with his job description, customarily assisted elderly persons through the door); *Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity*, 155 Ill. App. 3d 231, 238 (1987).

The only case cited by the plaintiff in support of this contention is *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326 (1965). *Darling*, however, does not support the proposition that a legal duty, which does not otherwise exist, may be created by a defendant's

internal policies or procedures. Whether a duty was owed by the defendant was not the issue in *Darling,* a medical malpractice case. Rather, the issue was whether evidence in the form of the defendant hospital's bylaws could be introduced on the question of the proper standard of care required to satisfy the duty. *Darling,* 33 Ill. 2d at 331. It was there held that such evidence was admissible, but not conclusive, on the issue of the appropriate standard of care. *Darling,* 33 Ill. 2d at 331. *Darling* is therefore inapplicable to this case.

Accordingly, we decline to hold that any ICG procedure created a duty on ICG's part to provide aid to Carl where the law did not otherwise impose such a duty.

## IV.

### Voluntary Undertaking

We briefly dispense with the appellate court's conclusion that, even if the law imposed no duty on ICG to aid Carl, ICG voluntarily undertook that duty and did so negligently by failing to "follow up" on the Chicago police department's response to its calls.

Pursuant to the voluntary undertaking theory of liability, one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking. *Frye v. Medicare-Glaser Corp.,* 153 Ill. 2d 26, 32 (1992); *Pippin v. Chicago Housing Authority,* 78 Ill. 2d 204, 209-10 (1979). The duty of care which arises in such a situation is, however, limited to the extent of the undertaking. *Vesey v. Chicago Housing Authority,* 145 Ill. 2d 404, 417 (1991); *Pippin,* 78 Ill. 2d at 210.

ICG here contends, and we agree, that it began no "voluntary undertaking" in this case which could render it liable for Carl's death. Assuming, as we must for this argument, that ICG owed no duty in the first instance

to rescue Carl, we find no voluntary undertaking on the part of ICG which gave rise to this duty. At most, ICG undertook to report Carl's presence to the Chicago police department and performed that undertaking by placing several calls to that department. We find nothing to indicate that ICG, by that action, voluntarily undertook to do anything more, such as ensuring that aid would be provided to Carl. See *Rowe v. State Bank*, 125 Ill. 2d 203, 218-19 (1988) (landlord did not voluntarily assume duty to protect tenants from criminal acts of third parties by providing lighting in the common areas and assuring that locks were in working order); *Pippin*, 78 Ill. 2d at 210 (CHA's duty was limited by the extent of its undertaking, to provide guard services, and did not render CHA under a duty to protect social guest from criminal attack).

As a matter of public policy, we do not think it appropriate to hold that a party voluntarily undertakes a legal duty to rescue an injured stranger by simply calling the police. Such a holding would discourage citizens from taking even this most basic action to obtain assistance for an injured stranger. We therefore reject the appellate court's voluntary undertaking theory as a basis for ICG's liability in this case.

## V.

### Carl's Status on Premises

ICG urges us to find that the evidence demonstrated, as a matter of law, that Carl was a trespasser on ICG's premises. According to ICG, the evidence showed that Carl was found intoxicated, surrounded by beer cans and sleeping in the warming house with no money, no ticket, and no apparent intention of boarding a train. There was testimony that access to this warming house, from other than the train tracks, is restricted by turnstiles. To gain entry through the turnstiles, a person

must purchase a ticket from a vending machine. However, it is possible, though apparently not authorized by ICG, for a person to enter the warming house without purchasing a ticket, such as by going over or under a turnstile, or by climbing onto the train platform from street level.

The plaintiff points to the trial court's comments that "there is a strong argument that [Carl] was a trespasser," but that his "physical presence in that location [the warming house] I think entitles plaintiff [an] inference that he could have been a patron." The plaintiff further points out that there was no evidence that anyone looked to see if Carl had a passenger ticket in his possession; that, even if Carl had no ticket, ICG allows persons to buy tickets on the train; and, further, Carl could have had a ticket when he entered the warming house but been robbed of that ticket.

We find that the evidence raised a jury question on the issue of Carl's status on ICG's premises. Where the facts surrounding the issue of a plaintiff's status on land are disputed, or different inferences may be drawn from undisputed facts, the plaintiff's status is a question of fact to be resolved by the jury. *Stephen v. Swiatkowski*, 263 Ill. App. 3d 694, 700 (1994). Here, both the facts and the inferences to be drawn therefrom with regard to Carl's status on ICG's premises are disputed by the parties. The issue is therefore properly left to the jury.

## VI.

### Sufficiency of Evidence

ICG further asks us to find that, even if a duty of ordinary care to aid Carl was owed by ICG, it fulfilled that duty as a matter of law. ICG contends that reversal of the jury's verdict and entry of a judgment in favor of ICG is therefore warranted. ICG highlights the evidence that it promptly responded to the discovery of Carl by

calling the Chicago police and by thereafter making several more calls for assistance to the Chicago police. The plaintiff counters that a breach of the duty to aid Carl could have been found based on ICG's failure, after it knew that the Chicago police had failed to respond, to take other action to aid Carl.

The jury determined that ICG had not fulfilled the duty to exercise ordinary care to aid or assist Carl. It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 189-90 (1990); see *Carney v. Smith*, 240 Ill. App. 3d 650, 658-59 (1992). Rather, a reviewing court may reverse a jury verdict only if it is against the manifest weight of the evidence. *Doser*, 142 Ill. 2d at 189. A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary or not based upon the evidence. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 106 (1995); *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). After carefully reviewing the record, we cannot say that the jury's finding that ICG breached a duty to exercise ordinary care to aid Carl was against the manifest weight of the evidence. Reversal and entry of a judgment in favor of ICG is therefore not appropriate. We, however, do not imply that we have made a finding on this issue that would be binding on remand.

## CONCLUSION

For the foregoing reasons, we hold that the jury was not properly instructed as to ICG's duty in this case. On that basis, we reverse the judgments of the appellate and circuit courts and remand this cause to the circuit court for a new trial. At retrial, the jury must determine whether Carl was a patron (invitee) or a trespasser on

ICG's premises, and must be further instructed in accordance with this opinion.

*Reversed and remanded*
*with directions.*